968 A.2d 724 (2009)
406 N.J. Super. 524
WAKEFERN FOOD CORPORATION; Shoprite of Oakland, Inc; Kearny Shoprite, Inc; Janson Supermarkets, Inc.; Grade A Markets, Inc.; Food Parade, Inc.; Brookdale Shoprite, Inc.; ShopRite Supermarkets, Inc.; Inserra Supermarkets, Inc.; and Glass Gardens, Inc., Plaintiffs-Appellants,
v.
LIBERTY MUTUAL FIRE INSURANCE COMPANY d/b/a Liberty Mutual, Defendant-Respondent.
DOCKET NO. A-2010-07T3.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 2009.
Decided April 22, 2009.
*726 Sherilyn Pastor, Newark, argued the cause for appellants (McCarter & English, L.L.P., attorneys; Ms. Pastor, Jerry P. Sattin and Katie A. Gummer, of counsel and on the brief; Jason M. Alexander, on the brief).
Christopher S. Finazzo, Short Hills, argued the cause for respondent (Finazzo, Cossolini, O'Leary, Meola & Hager, L.L.C., attorneys; Robert F. Cossolini and Rachel R. Hager, on the brief).
Before Judges LISA, REISNER and ALVAREZ.
The opinion of the court was delivered by
REISNER, J.A.D.
Plaintiffs, Wakefern Food Corporation and related companies,[1] appeal from *727 two orders entered by the Law Division on November 23, 2007, denying plaintiffs' motion for summary judgment and granting summary judgment in favor of defendant Liberty Mutual Fire Insurance Company (Liberty).

I
To summarize, on August 14, 2003, problems with the interconnected North American power system (the "electrical grid") resulted in a four-day electrical blackout over much of the northeastern United States and eastern Canada. As might be expected, plaintiffs, a group of supermarkets, suffered losses due to food spoilage during the blackout, in addition to incurring loss of business. Having paid a $5.5 million premium for insurance, covering (among other things) damage due to the loss of electric power, plaintiffs turned to their insurer, Liberty, to pay for their losses. Liberty, however, denied coverage, contending that its policy only applied in case of "physical damage" to off-premises electrical plant and equipment and that, although the power grid was physically incapable of supplying power for four days,[2] it suffered no "physical damage" and therefore there was no coverage. The policy did not define the term "physical damage."
The trial court granted summary judgment for Liberty, holding that the grid was not physically damaged because it could be returned to service after the interruption. The court also concluded that "the protective system [within the grid] worked to prevent physical damage to the types of equipment included in 1.B.(3) of the Services Away Extension." In other words, because the grid had safety features that shut down the generators and transmission equipment, and kept them turned off, the loss of power was not due to "physical damage," even though the event rendered the system incapable of producing electricity for four days. Concluding that the decision is inconsistent with well-settled principles of insurance law, we reverse and remand this matter to the trial court.

II
To place the legal issues in context, we set forth the facts in some detail. Plaintiffs own and operate supermarkets in five northeastern states, including New Jersey. For the period covering 2003, plaintiffs collectively purchased a first-party, all-risk insurance policy from Liberty. In addition to the basic policy, plaintiffs purchased from Liberty a "Services Away From Covered Location Coverage Extension" (Extension), which extended coverage for consequential loss or damage resulting from an interruption of electrical power to plaintiffs' supermarkets where that interruption is caused by "physical damage" to specified electrical equipment and property located away from the supermarkets.
Paul Truncellito, Wakefern's Director of Insurance, was responsible for purchasing "first party insurance coverage for Wakefern" and its member supermarkets. Truncellito "retained an insurance broker, BWD Group, LLC, (BWD), to assist in those efforts." BWD canvassed the insurance *728 marketplace for a policy that would satisfy Wakefern's requirements, bringing to Truncellito the bid from Liberty for the new policy. Liberty and Wakefern were not strangers to one another; Liberty had been Wakefern's "primary layer insurer" for its "property insurance program" since January 1, 2000.
Truncellito elected to purchase Wakefern's first-party, all-risk insurance coverage from Liberty. One reason for his decision was that Wakefern and its ShopRite members wanted "to have insurance coverage for food spoilage and other losses due to loss of power from utilities." Truncellito certified that, by purchasing the policy, he "understood that I had obtained this coverage from Liberty."
According to Truncellito, Wakefern "expressly sought and purchased" additional insurance coverage for "any losses [that] were not otherwise encompassed by the All Risk coverages." Thus, Truncellito indicated that Wakefern purchased the Extension because it wanted to insure against any losses not covered under the basic policy that might result from power outages. Truncellito certified that, by purchasing the Liberty policy and Extension, he "understood [that] we [Wakefern] had coverage for both local and system-wide power outages, including the outage that occurred on August 14, 2003. I was never told otherwise by Liberty Mutual and/or its agents."
Significantly, Truncellito also certified that "[n]either I nor anyone else at Wakefern had any role in the drafting of the Liberty Mutual Policy. Indeed, I did not understand that I had the power to negotiate the written provisions of the insurance policy sold to Wakefern by Liberty Mutual."
Wakefern purchased the first-party, all-risk insurance policy from Liberty for a total premium of $5,503,807 to cover the period from January 1, 2003 to April 1, 2004. Wakefern's purchase included the Extension, which extended coverage to Wakefern for consequential loss or damage resulting from an interruption of electrical power to the ShopRite stores.
Specifically, the Extension provided that:
A. We will pay for consequential loss or damage resulting from interruption of:
(1) Power;
....
B. We will pay only if the interruption results:
(1) From physical damage by a peril insured against;
(2) Away from a covered location; and,
(3) To the following types of property, if marked with an "X":
(X) Any powerhouse, generating plant, substation, power switching station, gas compressor station, transformer, telephone exchange;
....
(X) Transmission lines, connections or supply pipes which furnish electricity... to a covered location.
There was no dispute that Wakefern's ShopRite stores were "covered locations" and that "plaintiffs' food spoilage and other claimed losses constitute consequential loss or damage within the meaning" of the policy and Extension. Thus, the Extension pertinently provided that Liberty would pay for food spoilage and other consequential losses or damages incurred by Wakefern as a result of a loss of electrical power at its Shoprite stores, if the interruption of electrical power resulted from "physical damage" to specified electrical equipment and property located away from those stores. Significantly, the *729 term "physical damage" was not defined in the Extension or in the underlying policy.
The insurance policy and Extension that Truncellito purchased for Wakefield were in effect on August 14, 2003, when the power outages occurred that are the subject of this lawsuit. On that date, "large portions of the Midwest and Northeast United States and Ontario, Canada, experienced an electric power blackout." An estimated fifty million people were affected, "[a]t least 265 power plants with more than 508 individual generating units [were] shut down," and power was "not restored for 4 days to some parts of the United States." Significantly, the power blackout, which began in Ohio, affected four of the five states in which plaintiffs' ShopRite stores were operating: New Jersey, New York, Pennsylvania, and Connecticut.
The United States and Canada formed a task force to investigate the blackout, and that task force issued a Final Report[3] in April 2004 concerning the causes of the power failures. The Final Report identified "four major causes," including inadequate understanding of the electrical system by operators of a power company in Ohio; inadequate "situational awareness" by the same company; failure to manage tree growth along transmission-line lanes by that same company; and failure of the "interconnected [electric] grid's reliability organizations to provide effective real-time diagnostic support" to various operators on the grid. Aside from determining these causes of the blackout, the Final Report provided background information and set out a time line of events that led to and comprised the blackout.
According to the Final Report, the electric power system in North America is divided into three distinct power grids or "interconnections;" the blackout affected the "Eastern Interconnection," which covers the eastern two-thirds of the United States and a large portion of Canada. Such interconnections are necessary because "electricity flows at close to the speed of light ... and is not economically storable in large quantities. Therefore electricity must be produced the instant it is used."
Because the need for electricity in a particular area varies over time, a single power company would have to have a significant level of excess generating capacity available all the time in order to meet any increased electrical requirements. According to Liberty's expert electrical engineer, B. Don Russell,
[m]aintaining excess generating capacity in a ready condition represents significant cost. In order to increase reliability and reduce costs of operation and capital investment, electric utilities began to interconnect their systems with neighboring electric utilities over transmission lines. In this operating scenario, a given utility may buy or sell power as needed, relying on neighboring electric utilities to provide part of the required generating capacity to serve customer load. A utility with efficient generators and excess power can, therefore, sell to other utilities that may be experiencing a shortage of generation or have more expensive fuel sources for its generators.
Thus, in the Eastern Interconnection, "utility systems in that area east of the Rocky Mountains all the way to the Atlantic Ocean operate in a connected fashion, including Canada. Transmission lines are tied together and energy is shared."
*730 Through sharing of electrical energy among utilities through the web of connected transmission lines in the Eastern Interconnection, electrical energy produced at one place in the interconnection may be transmitted to and used at any other point in the interconnection. As explained in the Final Report, "[w]ithin each interconnection, electricity is produced the instant it is used, and flows over virtually all transmission lines from generators to loads." Thus, when the various operating systems that control the Eastern Interconnection determine that electricity has been consumed within the interconnection, generators are called upon to produce replacement electricity that may potentially flow over all of the interconnection's extensive system of transmission lines to all users of electricity within the interconnection. Consequently, an end user of electrical power would not be able to identify the precise source of that power within the interconnection.
One goal of the interconnection is to "[b]alance power generation and demand continuously." Thus, "under normal operation, all of the generators in the interconnection work together at the same electrical system frequency to balance net generation with load," that is, with electrical power demand. When there is a sudden increase in demand for power or a "sudden loss of generation anywhere in the interconnection, all of the generators in the system sense the same frequency disturbance, and all the generators work together, though in different proportion, to increase generation and restore frequency."
Unfortunately, situations develop which make it impossible to restore balance and stability to the interconnection. As explained by Liberty's expert:
When electric utilities are heavily interconnected, sharing large amounts of power over transmission lines, a problem such as the loss of a generator or a transmission line in one utility may adversely affect or positively assist the electrical operations of all surrounding utilities. Ironically, the interconnection of electric utilities, which under most circumstances causes increased reliability from shared generation capacity, also makes electric utilities vulnerable to cascading outages caused by significant events in neighboring utilities.
Such "significant events" include failures involving generators and transmission lines.
According to Liberty's expert, a cascading outage or blackout, like the one that affected the Eastern Interconnection on August 14, 2003, occurs when an interconnection becomes unstable because of inadequate generation capacity, transmission-line failure, or other abnormalities. Because of the instability and imbalance that results from such abnormal events in one part of the interconnection, "protection systems" operate to prevent physical damage to very expensive generators and transmission lines throughout the rest of the interconnection.
Protection systems "continually monitor the electric power system for abnormal conditions or short circuits and generally operate very rapidly, detecting faults and causing breakers to operate in milliseconds." Unfortunately, according to Liberty's expert
the wide variation of voltage, frequency, and power swings that occur during a cascading outage frequently "fool" protective relay devices into operating breakers and disconnecting lines and apparatus that otherwise could have remained energized. The most common cause of large scale power outages is the unnecessary or untimely operation of protective relaying systems to operate *731 circuit breakers and disconnect and/or separate large portions of the electric power system. While protective relay devices are absolutely necessary and must operate very quickly in order to protect apparatus from physical damage, their speed of operation causes occasional misoperations, particularly in response to the abnormal electrical conditions caused by power swings during a cascading blackout.
Operations of protective relays during a cascading power outage can exacerbate the outage, spreading it to a much larger area than originally affected by the root cause event. Engineers continually work to improve the protective relay systems, making them more reliable and secure, but there is no known method for ensuring that protective relays will only operate when absolutely necessary. In the operation of a large interconnected electric power system, the rapid response of protective relay devices is a requirement, but also a recognized problem with respect to the potential for creating a large scale cascading blackout.

[Emphasis added.]
Liberty's expert opined that the "root cause" of the far-reaching power blackout of August 14, 2003, was "the de-energizing of transmission lines by the proper operation of protective relay devices." Also, according to Liberty's expert, the
hundreds of generators and lines that were tripped out of service during the cascading outage do not represent causes of the outage, but rather the consequence of the proper operation of protective devices attempting to de-energize and separate equipment in order to avoid damage as a result of the outage.
In offering this explanation, Liberty's expert was echoing the conclusion expressed in the Final Report, which characterized the power-outage cascade that caused the blackout as a "race between the power surges and the [protective] relays."
Liberty's expert opined that the various "protection systems" and devices that were present on transmission lines and generators were "[i]mportant components of the electric power system" because such systems and devices were the "key to preventing physical damage to electrical lines and apparatus when abnormal events occur." Additionally, Liberty's expert testified at his deposition that some of these protection systems and devices, especially those concerned with protecting steam generators, were physically damaged when they operated to disconnect the protected electrical equipment from the interconnection during the blackout. Liberty's expert did not consider such physical damage to be of any relevance, however, because "certain systems ... are designed to fail as a consequence of keeping the system safe."
Liberty's expert further testified that protection systems that incurred such physical damage as a result of their operation had to be repaired or replaced before the equipment to which they were attached could begin operating again. Liberty's expert considered it to be a "defi[ni]tional issue" whether such purposeful damage constituted actual "physical damage" for insurance purposes. For his part, plaintiffs' expert stated in his report that, during the blackout that precipitated this litigation, "many transmission lines experienced faults or overload conditions and several circuit breakers were damaged."
In his December 22, 2006 report, Scott Greene, plaintiffs' expert electrical engineer, described in considerable detail the damage to various portions of the electrical grid. He also described the manner in which the blackout occurred, relying heavily *732 on the Final Report. He opined that the blackout
resulted from, among other things, physical damage to power generating and transmission equipment at sites located away from the ShopRite supermarkets that are the subject of the Complaint. The physical damage to power generating and transmission equipment was a substantial factor which, singly and in combination with other factors, caused, contributed to, and increased the scope and duration of the Outage....
Moreover, it is my opinion that to a reasonable degree of engineering probability, the electric power system as a whole, the Eastern Interconnect, which should have provided electricity to the northeast on August 14, 2003 and subsequent days, was physically damaged in that various components were rendered inoperable or were disconnected from the grid and needed to be reconnected and restored. It is also my opinion that to a reasonable degree of engineering probability, power generating and transmission equipment that fails to function or that causes or threatens to cause property damage or personal injury is physically damaged.
In his report, defendant's expert, B. Don Russell, described much the same phenomena as Greene, repeating in detail information gleaned from the Final Report. However, Russell insisted that what occurred should not be characterized as "damage."
The power blackout that occurred on August 14, 2003, began a little after 4:00 p.m. (Eastern Daylight Time), when three large transmission lines in northern Ohio sagged and came into contact with trees that had not been properly maintained at a safe height. Those transmission lines were disengaged from the interconnection by their protective devices, and the electric current that they carried was automatically rerouted to other lines. One of those other lines, the 345-kilovolt Sammis-Star transmission line, became overloaded, and its protection system operated at 4:06 p.m. to disconnect it from the interconnection.
According to the Final Report, the "loss of [the] Sammis-Star line triggered" the "uncontrollable 345 kV cascade portion of the blackout sequence." This was so because "the loss of the heavily overloaded Sammis-Star line instantly created major and unsustainable burdens on lines in adjacent areas, and the cascade spread rapidly as lines and generating units automatically tripped by protective relay action to avoid physical damage."
The Final Report noted that an electrical "cascade is a dynamic phenomenon that cannot be stopped by human intervention once started. It occurs when there is a sequential tripping of numerous transmission lines and generators in a widening geographic area." By 4:12 p.m., the cascade was essentially completed, and much of the northeastern United States and a large portion of Canada were without electrical power. Plaintiffs were among the many businesses that lost electrical service at that time.
Following the blackout, Liberty denied plaintiffs' claims for spoiled food and business interruption both under the "direct physical loss or damage" portions of the policy and under the "physical damage" part of the Extension. In doing so, Liberty characterized the food-spoilage damages as consequential and not direct losses[4] *733 and asserted that plaintiffs had failed to present "evidence of any physical damage to transmission lines, connections or supply pipes which furnish electricity to any covered location." On May 18, 2004, Wakefern's insurance broker, BWD, sent a letter to Liberty, objecting to the denial of plaintiffs' claims and noting that the dearth of comment in the Final Report concerning physical damage to electrical equipment as a result of the blackout was not surprising because the Final Report "examines the blackout from an operational/systems point of view and does not address in detail the damaged transmission and distribution equipment." Liberty nonetheless declined coverage and this litigation followed.
III
Our review of the trial court's summary judgment decision is plenary:
In deciding a motion for summary judgment, the trial court must determine whether the evidence, when viewed in a light most favorable to the non-moving party, would permit a rational fact-finder to resolve the dispute in the non-moving party's favor. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). The trial court cannot decide issues of fact but must decide whether there are any such issues of fact. Ibid.; R. 4:46-2(c). Our review of a trial court's summary judgment decision is de novo, applying the Brill standard. Prudential Property Ins. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998).
[Agurto v. Guhr, 381 N.J.Super. 519, 525, 887 A.2d 159 (App.Div.2005).]
The principles for construction of the insurance policy at issue here are likewise well-established:
Generally, the insured has the burden "to bring the claim within the basic terms of the policy." Where the language of a policy supports two reasonable meanings, one favorable to the insurer and one favorable to the insured, the interpretation supporting coverage will be applied. Where an insurer claims the matter in dispute falls within exclusionary provisions of the policy, it bears the burden of establishing that claim. Coverage clauses are interpreted liberally, whereas exclusions are strictly construed. Further, as with any contract, construing insurance policies requires a broad search "for the probable common intent of the parties in an effort to find a reasonable meaning in keeping with the express general purposes of the policies." Finally, insurance contracts are to be interpreted so as to effectuate the reasonable expectations of the insured.
[S.T. Hudson Eng'rs, Inc. v. Pa. Nat'l Mut. Cas. Co., 388 N.J.Super. 592, 603-04, 909 A.2d 1156 (App.Div.2006), certif. denied, 189 N.J. 647, 917 A.2d 787 (2007) (citations omitted).]
We have applied these general principles of construction to first-party insurance policies, including all-risk policies,[5] as well as third-party liability policies. See Victory Peach Group, Inc. v. Greater N.Y. Mut. Ins. Co., 310 N.J.Super. 82, 87-90, 707 A.2d 1383 (App.Div.1998); Kopp v. Newark Ins. Co., 204 N.J.Super. 415, 420, 499 A.2d 235 (App.Div.1985).[6] Further, it *734 is well settled that those purchasing insurance "should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded `to the full extent that any fair interpretation will allow.'" Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 482, 170 A.2d 22 (1961) (quoting Danek v. Hommer, 28 N.J.Super. 68, 76, 100 A.2d 198 (App.Div.1953), aff'd o.b., 15 N.J. 573, 105 A.2d 677 (1954)). See also President v. Jenkins, 180 N.J. 550, 563, 853 A.2d 247 (2004) ("The doctrine has been applied to all forms of insurance contracts."); Customized Distribution Services v. Zurich Ins. Co., 373 N.J.Super. 480, 487-88, 862 A.2d 560 (App.Div.2004), certif. denied, 183 N.J. 214, 871 A.2d 91 (2005).
These principles apply to commercial entities as well as individual insureds, so long as the insured did not participate in drafting the insurance provision at issue. Benjamin Moore & Co. v. Aetna Cas. & Sur. Co., 179 N.J. 87, 843 A.2d 1094 (2004):
When there is doubt ... regarding the existence of coverage, that doubt is ordinarily resolved in favor of the insured. An exception to that rule exists for sophisticated commercial entities that do not suffer from the same inadequacies as the ordinary unschooled policyholder and that have participated in the drafting of the insurance contract.

[Id. at 102, 843 A.2d 1094 (emphasis added and citations omitted).]
It is undisputed that Wakefern did not negotiate the Services Away Extension or any of its provisions.
We conclude that the undefined term "physical damage" was ambiguous and that the trial court construed the term too narrowly, in a manner favoring the insurer and inconsistent with the reasonable expectations of the insured. In the context of this case, the electrical grid was "physically damaged" because, due to a physical incident or series of incidents, the grid and its component generators and transmission lines were physically incapable of performing their essential function of providing electricity.[7] There is also undisputed evidence that the grid is an interconnected system and that, at least in some areas, the power could not be turned back on until assorted individual pieces of damaged equipment were replaced. However, we do not rest our decision on that evidence. Rather, we look at the larger picture concerning the loss of function of the system as a whole.
We recognize that, to some extent, the blackout was caused by a combination of fortuitous events, together with the operation of safety features built into the system to insure that the essential elements of the grid would not be severely damaged. However, in concluding that the term "physical damage" is ambiguous, we consider the context, including *735 the identity of the parties. See Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 176, 607 A.2d 1255 (1992). These were not two electric utilities contracting about the technical aspects of the grid. Rather, the parties are an insurance company, in the business of covering risks, and a group of supermarkets that paid for what they believed was protection against a very serious riskthe loss of electric power to refrigerate their food. The average policy holder in plaintiffs' position would not be expected to understand the arcane functioning of the power grid, or the narrowly-parsed definition of "physical damage" which the insurer urges us to adopt. See Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 247, 405 A.2d 788 (1979). In this context, we conclude that if Liberty intended that its policy would provide no coverage for an electrical blackout, it was obligated to define its policy exclusion more clearly.
We acknowledge that based on the highly technical analysis in the Final Report, one could certainly argue that the system was not physically damaged. However, the report was not written for the purpose of construing insurance policies; it was written as an operational analysis for the purpose of determining how the blackout occurred, who was at fault, and how future blackouts could be avoided. Moreover, from the perspective of the millions of customers deprived of electric power for several days, the system certainly suffered physical damage, because it was incapable of providing electricity. The fact that the term "physical damage" is capable of at least two different reasonable interpretations convinces us that it is ambiguous. And well-established precedent teaches that such an ambiguous provision must be construed favorably to the insured. S.T. Hudson, supra, 388 N.J.Super. at 603-04, 909 A.2d 1156.
We find support for our conclusions in precedent from this State as well as from other jurisdictions. In a case involving construction of the term "physical loss" as it applied to the loss in value of a soft drink product stored at the insured's warehouse, we concluded that the term was ambiguous: "Since `physical' can mean more than material alteration or damage, it was incumbent on the insurer to clearly and specifically rule out coverage in the circumstances where it was not to be provided, something that did not occur here." Customized Distribution, supra, 373 N.J.Super. at 491, 862 A.2d 560.
In Western Fire Insurance Co. v. First Presbyterian Church, 165 Colo. 34, 437 P.2d 52 (1968), the Colorado Supreme Court held that a church, required by the local fire department to shut down due to infiltration of gasoline vapors, had suffered a "physical loss" within the meaning of its insurance policy. Placing the facts in context, the court reasoned:
It is perhaps quite true that the so-called "loss of use" of the church premises, standing alone, does not in and of itself constitute a "direct physical loss." A "loss of use" of course could be occasioned by many different causes. But, in the instant case, the so-called "loss of use," occasioned by the action of the Littleton Fire Department, cannot be viewed in splendid isolation, but must be viewed in proper context. When thus considered, this particular "loss of use" was simply the consequential result of the fact that because of the accumulation of gasoline around and under the church building the premises became so infiltrated and saturated as to be uninhabitable, making further use of the building highly dangerous. All of which we hold equates to a direct physical loss within the meaning of that phrase as used by the Company in its Special Extended *736 Coverage Endorsement insuring against "all other risks."
[Id. at 38-39, 437 P.2d 52.]
The Colorado court also quoted with approval from Hughes v. Potomac Insurance Co., 199 Cal.App.2d 239, 18 Cal.Rptr. 650 (1962), a case in which, due to a landslide, the insured's house wound up on the edge of a cliff, rendering the premises uninhabitable:
The policy in the Hughes case was like the policy in the instant case, and insured against all risks of physical loss and damage to the dwelling. There, as here, it was contended that the insured suffered no direct physical loss. In rejecting this argument the First Appellate District of the California District Court of Appeals made the following pertinent comment:
To accept appellant's interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such a position as to overhang a steep cliff has not been "damaged" so long as its paint remains intact and its walls still adhere to one another. Despite the fact that a "dwelling building" might be rendered completely useless to its owners, appellant would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.
[Id. at 40-41, 437 P.2d at 55-56 (quoting Hughes, supra, 18 Cal.Rptr. at 655).]
In Southeast Mental Health Center, Inc. v. Pacific Insurance Co., 439 F.Supp.2d 831 (W.D.Tenn.2006), the court concluded that "physical damage" could include loss of "functionality" even if the affected machinery remained intact:
The Court finds that the corruption of the pharmacy computer constitutes "direct physical loss of or damage to property" under the business interruption policy. In a case similar to the one at bar, [an unpublished decision, Am. Guar. & Liab. Ins. Co. v. Ingram Micro, Inc., No. CIV 99-185 TUC ACM, 2000 WL 726789 (D. Ariz. [April 18,] 2000),] a wholesale distributor of microcomputer products, Ingram, suffered a power outage at its data center. Ingram processed all of its orders through its computer system, which was located at the data center. Power was restored within half an hour, but a number of Ingram's mainframe computers lost information and had to be reprogrammed. Additionally, several custom configurations were lost even after power was restored and had to be reprogrammed. These technical difficulties impeded Ingram's ability to conduct business. Ingram had insurance covering "All Risks of direct physical loss or damage from any cause."
The Ingram court found that Ingram's computer system had sustained direct physical damage ..., [stating that] "`physical damage' is not restricted to the physical destruction or harm of computer circuitry but includes loss of access, loss of use, and loss of functionality." The computers "physically lost programming information and custom configurations necessary for them to function" when they were damaged by the power outage. The Court finds the Ingram court's reasoning persuasive, and finds that Plaintiff's pharmacy computer sustained direct physical damage, within the meaning of the business interruption provision.
[Id. at 837-38 (citations omitted).]
Other cases have likewise accepted the view that "damage" includes loss of function or value. See Dundee Mut. Ins. Co. v. *737 Marifjeren, 587 N.W.2d 191, 194 (N.D. 1998); Gen. Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 152 (Minn.Ct.App. 2001); Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co., 24 A.D.3d 743, 806 N.Y.S.2d 709, 711 (2005).
We find no basis in the language of the Liberty policy, or in any of the foregoing cases, to require that the physical damage to the power source be permanent. We therefore cannot agree with the trial court's conclusion that "the definition of `physical damage' cannot be extended in this case to include the temporary loss of use due to a power interruption, because the property resumed its former use or function as soon as the power was restored, and its value was not diminished." If the phrase "the property" refers to plaintiffs' premises, it is misdirected. The relevant "physical damage" in this case was to the power source, which collapsed, albeit temporarily. Moreover, the off-premises power failures covered by the Liberty policy will always be temporary, because power will always be restored eventually. Here, the power outage lasted four days, but it was catastrophic. The Services Away Extension would be virtually worthless if it only applied to the permanent destruction of the grid's electrical generating capacity.
We reject defendant's argument that the blackout involved no "physical damage" because none of the generators was ruined and the system eventually went back online. In reality, the entire system was incapable of producing power for several days. Defendant's attempt to characterize this catastrophe as involving only a series of well planned fail-safe events is unpersuasive.
Liberty's reliance on Port Authority of New York and New Jersey v. Affiliated FM Insurance Co., 311 F.3d 226 (3rd Cir. 2002), is misplaced. That case involved asbestos contamination of a building. The insured, a governmental agency, sought coverage under a policy the relevant provisions of which were drafted by the insured rather than by the insurer. Under those facts, the federal court declined to apply our State's usual principles for construing insurance contracts:
Although New Jersey Courts generally read policies in favor of the insured, they "should not write for the insured a better policy ... than the one purchased." [Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 116 N.J. 517, 529, 562 A.2d 208 (1989)]. One of the frequently cited reasons for interpreting language in favor of the insured is that insurance policies are generally contracts of adhesion, which offer little choice to the purchaser. This justification, though, has little application in this case. As is often the situation with large, knowledgeable business firms, the contracts were manuscript policies negotiated and drafted by the insured.
[Id. at 235.]
The court concluded that a claim for asbestos-related damage to the building required that the building be rendered unusable. The principles the court espoused, however, are not inconsistent with a finding of coverage in the case before us, where the cascading outage rendered the electric power generators temporarily unusable:
In ordinary parlance and widely accepted definition, physical damage to property means "a distinct, demonstrable, and physical alteration" of its structure. 10 Couch on Insurance § 148:46 (3d ed. 1998).... Physical damage to a building as an entity by sources unnoticeable to the naked eye must meet a higher threshold. The Colorado Supreme Court in Western Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34, *738 437 P.2d 52 (1968), concluded that coverage was triggered when authorities ordered a building closed after gasoline fumes seeped into a building's structure and made its use unsafe. Although neither the building nor its elements were demonstrably altered, its function was eliminated.

[Id. at 235-36 (emphasis added).]
We find Liberty's reliance on Lyle Enterprizes, Inc. v. Hartford Steam Boiler Inspection and Insurance Co., 399 F.Supp.2d 821, 826 (E.D.Mich.2005), equally unpersuasive. That case involved an insurance claim filed by a supermarket, whose premises were affected by the 2003 blackout. However, the insurance policy at issue there required that the damage be attributable to an "accident," defined as "direct physical damage" to "covered equipment." Id. at 822. To that extent, the case is distinguishable based on the difference in policy language. Although the federal court was sitting in diversity, the case is also noteworthy for the absence of any discussion of Michigan law concerning the interpretation of insurance contracts.
Notably, the court accepted as undisputed the defendant insurance company's factual description of the 2003 blackout as it affected Detroit Edison:
Defendant HSB contends that the blackout is excluded from the Policy's definition of an "accident" because the blackout caused damage to power equipment in Ohio, not in Michigan. In Detroit Edison's Report, it notes that generator and transmission line outages in northern Ohio led to "several alarms indicating low voltage on the ITC and DE transmission, sub-transmission and distribution systems...." As a result, Detroit Edison increased its power output. When subsequent failures in Ohio's electric lines occurred, "power flowing from southern and eastern Ohio sought alternative paths into northern Ohio. A substantial portion began flowing across Indiana and surged into southwestern Michigan." "The balance of power ... looped eastward around Lake Erie in a counter clockwise direction through Pennsylvania, New York, Ontario, and into southeast Michigan across the Michigan-Canada ITC-IMO interface." The sudden power surge on an already heavily loaded transmission path started a voltage collapse on the Michigan system.
Protective equipment caused certain sites in central Michigan to go out of service, eliminating their power generation to the Michigan power grid. This caused other Detroit Edison power generators to increase their power output, some to as much as 300 percent of their rate output capacity to boost sagging voltages. "This dramatic increase in reactive output required generating units to increase field current and resulted in damage to the exciter (the component that provides field current) at at least one plant." The system began to stabilize by cutting off the western side of the state from southwestern Michigan. This "caused a full-scale catastrophic collapse in the ICD/Detroit Edison service territory."
[Id. at 824-25 (citations omitted).]
Despite the admitted "catastrophic collapse" of Detroit Edison's power-producing capacity, the court concluded that there was no "direct physical damage" and hence no coverage, because protective equipment shut down the system to prevent physical damage: "[T]here is nothing in the record to indicate that [the supermarket's] loss of power was caused by direct physical damage to Detroit Edison's equipment. Rather, *739 it was the engaging of the protective equipment which caused [the supermarket to lose] power." Id. at 826. We find the court's analysis unpersuasive, and to the extent that Liberty would have us apply this narrow construction to the more general "physical damage" clause of its policy, we decline.
In view of our construction of the separate Services Away Extension as covering the loss here, we do not address plaintiffs' argument premised on the all-risks portion of the basic policy pertaining to "direct physical loss to covered property." We note, however, that if the basic policy covered this situation, it is difficult to perceive why the insured would have procured the Services Away Extension.
We also find no merit in Liberty's contention that the "excluded perils" provision of the basic policy precludes coverage here. This argument warrants no extended discussion, R. 2:11-3(e)(1)(E), beyond noting that the perils described are in the main policy, not the Services Away Extension, and they address potential perils within the insured's premises. Moreover, if the exclusion for problems with electrical disturbances were read to apply here it would negate the Services Away Extension for electrical outages.
For all of these reasons, we conclude that summary judgment should not have been granted to Liberty, and that plaintiffs were entitled to summary judgment on the issue of coverage. Accordingly, we reverse the two orders on appeal and remand this case to the trial court for further proceedings consistent with this opinion.
Reversed and remanded.
NOTES
[1] Wakefern Food Corporation (Wakefern) is a "retailer-owned cooperative comprised of forty-three members who individually own and operate 190 ShopRite stores in New Jersey, New York, Connecticut, Pennsylvania, and Delaware." The other nine plaintiffs are "Wakefern members that own and operate Shoprite stores" in New Jersey, New York, and Connecticut.
[2] Power in some areas was restored sooner than four days. In some parts of Canada the outage lasted longer than four days.
[3] The parties relied primarily upon the Final Report in arguing their summary judgment motions, but the submitted report by plaintiffs' expert referred to several other investigations and reports concerning the blackout, upon which the expert relied.
[4] Liberty did, however, determine that "certain equipment on [Wakefern's] premises" had been damaged as a result of the blackout and that plaintiffs had therefore suffered the "direct physical loss" of that equipment. Liberty "measured the covered portion of Wakefern's claim to be in the amount of $62,887.65," which amount Liberty evidently paid to plaintiffs.
[5] At her deposition, Liberty's underwriting representative, Kristen Bukofsky, confirmed that the Liberty policy was an all-risk policy.
[6] We do not read Judge Pressler's opinion in Winding Hills Condominium Association, Inc. v. North American Specialty Insurance Co., 332 N.J.Super. 85, 92-93, 752 A.2d 837 (App. Div.2000), as holding that our traditional principles for construing insurance contracts do not apply to first-party insurance contracts. For policy reasons specific to environmental pollution and toxic tort cases, Winding Hills held that the manifest trigger rule was appropriately applied to first-party coverage, even though the continuous trigger theory applied to third-party coverage.
[7] We would reach a different result if, for example, a governmental agency had ordered that the power be shut off to conserve electricity. See Source Food Tech., Inc. v. U.S. Fid. & Guar. Co., 465 F.3d 834 (8th Cir. 2006)(no coverage for insured's inability to obtain beef product due to government action prohibiting importation of Canadian beef).