**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3905-21

DIALECTIC DISTRIBUTION
LLC, and DIALECTIC PR LLC,

     Plaintiffs-Appellants,

v.

CERTAIN UNDERWRITERS AT
LLOYD'S LONDON SUBSCRIBING
TO POLICY NUMBERS
B0507CG1900631 and
BG0507CG2001218,

     Defendant-Respondent.

_____

Argued November 27, 2023 – Decided December 11, 2023

Before Judges Sabatino, Mawla, and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-6801-20.

Stephen A. Weisbrod (Weisbrod Matteis & Copley PLLC) of the District of Columbia, California, Florida, Illinois, New York, and Washington bars, admitted pro hac vice, argued the cause for appellants (Rubenstein Business Law and Stephen A. Weisbrod, attorneys;

David Joshua Rubenstein, of counsel and on the briefs; Stephen A. Weisbrod, on the briefs).

John Woods (Clyde & Co US LLP) of the New York bar, admitted pro hac vice, argued the cause for respondent (Clyde & Co US LLP, attorneys; Kevin M. Haas and John Woods, of counsel and on the brief; Digisha R. Bhavsar and Spenser Swaczyk, on the brief).

PER CURIAM

Plaintiffs Dialectic Distribution LLC and Dialectic Distribution PR LLC appeal from an August 5, 2022 order granting summary judgment to defendant Certain Underwriters at Lloyd's London. We affirm.

I.

Plaintiffs are global distributors and resellers of consumer electronics. However, in early 2020, when health officials were beginning to urge the public to wear facemasks to help prevent the spread of COVID-19, plaintiffs expanded their operations and entered the mask market. They purchased millions of KN95 facemasks from Chinese suppliers for import to and sale in the United States and Europe. The masks were supposed to meet a ninety-five percent filtration specification as their American-made counterparts (N95 masks). However, the Chinese-made KN95 masks would prove inferior and less effective.

2

## Facts Concerning the Masks

The first shipment of masks arrived in May 2020 and were detained by U.S. Customs and Border Protection at airports in New York, Los Angeles, and Chicago, as well as by the Governance of Economics in Brussels, Belgium. Most of the masks imported to the United States were subject to Food and Drug Administration (FDA) hold notices, which prohibited plaintiffs from selling the masks as labeled until released by the FDA.

All the 640,000 masks shipped to the United States were eventually released between May 27 and June 5, 2020. The FDA permitted plaintiffs to market 140,000 of the masks, which were mislabeled as KN95, but had an average filtration efficiency of 22.33%, by relabeling them to reflect their true efficiency.

On July 8, 2020, 750,000 masks were shipped to Chicago and detained. Customs released 250,000 masks on September 4, 2020, but they were subject to a hold notice because they were misbranded with a label stating: "'KN95 Protective Mask' greater than or equal to '95% Bacterial Filtration Efficiency.'" The remaining 500,000 masks were not released by customs.

1,000,000 masks were shipped to Los Angeles and likewise detained by customs and subject to FDA hold notices. The hold notices were never released,

A-3905-21

and plaintiffs mitigated their losses by returning the masks to Hong Kong pursuant to an export bond.[1]

Of the 1,859,050 masks shipped to Belgium, 866,400 were detained by authorities. Testing performed by Belgian customs revealed the masks did not meet the European equivalent of the KN95 standard for filtration efficiency. The Belgian authorities required plaintiffs to relabel the masks before they could be sold. The disposition of the remaining 992,650 masks is unclear from the record.

Facts Concerning Plaintiffs' Insurance Broker

Before plaintiffs purchased the masks, they contacted their insurance broker in April 2020 to secure product insurance coverage. Zach Zelter, plaintiffs' CEO; Anthony Ficano, plaintiffs' Director of Global Operations; and Mark Hoenes, a Dialectic employee, were the points of contact for the broker. Sophia Jack, worked for the broker, and was the contact for plaintiffs.

Plaintiffs inquired about the definitional limits of coverage. On April 15, 2020, Jack emailed Zelter as follows:

> Regarding the confiscation by governmental agencies
> question, the response to this is two[]fold:

---

[1] Plaintiffs advise they have lawsuits pending against the manufacturers in the Hong Kong and Singapore courts.

A-3905-21

[Defendant's] policy is a policy of physical loss or damage from any external cause. Should your goods be confiscated, the inference is that the goods will be returned to you (the Insured) at a later date assuming there has been no physical loss to the goods and you (the Insured) finally does receive the goods safely then there would be no loss. However, should the goods be confiscated and then used by that governmental agency or its assigns, then this would be considered as theft which would be recoverable under the policy.

On May 14, 2020, Ficano sent the following email to Jack:

Could we include wording like something below?

In the event there is a government seizure of goods and the goods are put on hold by a government agency for any or no reason we could file a claim and the claim would be considered a total loss. We will be indemnified for the full amount value . . . of the goods being held. Can we get confirmation that this will be written into the body of the policy or added to the endorsement?

Jack forwarded the email to defendant asking whether confiscation and expropriation wording could be added to the policy. That proposed language was as follows:

(a) This policy is to cover loss of and/or damage to the property hereby insured directly caused by confiscation, seizure, appropriation, expropriation, requisition for title or use or willful destruction by/or under the order of the [g]overnment . . . and/or public or local authority . . . .

A-3905-21

On May 15, 2020, defendant responded the proposed language was unacceptable. Zelter and Ficano claimed neither of them received a copy of defendant's response.[2]

### The Policy Language

Defendants issued two marine "Stock Throughput" policies to plaintiffs with policy periods of May 17, 2019, to May 17, 2020; and May 17, 2020, to May 17, 2021. The "Conditions" sections of both policies offered coverage "[a]gainst all risks of physical loss or damage to the subject-matter insured from any external cause." The policies also contained a "Customs and/or Immigration Authority Inspection(s)" provision, which stated:

> This insurance is also specially to cover (notwithstanding the War Exclusion Clause contained herein) physical loss of or damage to the subject matter insured arising out of the performance of inspection duties by the relevant Customs and/or Immigration Authorities or another duly constituted governmental agency of any State or Territory who are performing inspection duties in accordance with any governmental law, statute, mandate, rule or regulation covering the import or export of said subject-matter into or from the applicable State or Territory, or covering whilst said subject matter is passing through such State or Territory prior to coming within the jurisdiction of the State or Territory of destination.

---

[2] Plaintiffs did not sue the broker, and there are no claims asserted against the broker as a third party.

A-3905-21

[(emphasis added).]

The policies included a "Risks Covered" provision, which stated:

> Without limitation to coverage otherwise provided for herein the following perils clause is incorporated herein;

> Touching the adventures and perils which the Insurers are contented to bear and do take upon themselves in this voyage, they are of the seas and inland waters, men-of-war, fire, enemies, pirates, rovers, thieves, jettison, letters of mart and countermart, surprisals, takings at sea, arrests, restraints and detainments of all Kings, Princes and People of what nation, condition, or quality soever, barratry of master and mariners, and of all other like perils, losses or misfortunes that have or shall have come to the hurt, detriment or damage of the said goods and merchandises and ship, or any part thereof.

### Plaintiff's Insurance Claims and This Litigation

When the masks were detained, plaintiffs filed a claim citing the "[a]gainst all risk of physical loss or damage . . . from any external cause" and the "physical loss of or damage to the subject matter insured arising out of the performance of inspection duties" provisions in the "Customs and/or Immigration Authority Inspections" section of the policy. Defendant declined coverage, contending the temporary detention of the masks for inspection was not a physical loss under the policies because the masks were returned to plaintiffs undamaged.

7

In November 2020, plaintiffs filed a complaint in the Law Division against defendant alleging breach of contract, bad faith, and breach of the implied covenant of good faith and fair dealing. The complaint sought compensatory, punitive, direct, incidental, and of consequential damages, along with attorney's fees. An expert calculated the damages based on lost profits and opined there were millions of dollars[3] in losses due to the detainments by comparing the pre-detention sales price of KN95 masks sold as ordinary face coverings to the post-detention sales price.

Plaintiffs moved for partial summary judgment, declaring their losses resulted from the detainment of the masks by government entities were covered "physical losses" under the policies. The motion judge denied the motion and concluded plaintiffs did not suffer "a physical loss from [the] lawful detainment of the masks for inspection." The plain terms of the policies provided coverage for "damage [or] physical change to the product" but did "not cover diminution in value from lawful inspection."

Separately, defendant cross-moved for summary judgment arguing plaintiffs neither alleged nor demonstrated physical loss or damage to the masks

---

[3] More specific estimates are set forth in plaintiffs' confidential appendix, which we need not detail here.

A-3905-21

required for coverage under the policies.  The motion judge granted defendant's motion and dismissed plaintiffs' complaint.

The judge framed the issue as "whether the lawful government detainment for inspection of masks, imported from China, for a period of months resulting in a diminution in value, qualifies under the insurance policies as a physical loss."  She noted the "condition of coverage under the policies [was] for the risk of physical loss or damage to [the masks from] an 'external cause.'"

The judge concluded plaintiffs did not suffer "a 'physical loss' from an 'external force' by the lawful detainment of the masks by [c]ustoms for government regulated inspections."  The "plain terms of the policies [did] not provide . . . plaintiffs coverage for diminution in value from lawful detention for inspection."  Likewise, the policies' customs and immigration authority inspection provision provided coverage "for physical loss and damage arising out of the performance of inspection duties[,] . . . not diminution in value from [c]ustoms' detainment."

There was no physical loss because "[t]he masks were not damaged, altered, or harmed" by the customs process, and no government acts "changed the utility, . . . composition, or . . . perception of the product's character."  Plaintiffs had not been "permanently denied complete and total 'access to

property' confiscated for government use," there was no "damage from an incident at the building or structure site," or a claim "the masks were lost at sea."

The judge noted the evidence suggested plaintiffs were aware of customs risks and could have purchased additional coverage for the type of detainments at issue but did not. She cited text messages between Zelter and the manufacturers in China, in which he sought assurances regarding the efficacy of the masks, and the emails between plaintiffs and the broker regarding the language of the policies. The judge concluded plaintiffs "were clearly aware of [the] detention and regulations issues and inquired as to insurance coverage. . . . Greater insurance coverage for losses was offered at an extra cost but declined by plaintiffs."

The judge noted the case law, including Mac Property Group LLC v. Selective Fire and Casualty Insurance Company, 473 N.J. Super. 1 (App. Div. 2022), stated a "physical loss occurs when the insured property suffers a detrimental physical alteration." Plaintiffs had to prove a "physical injury," "physical damage," or "harm to the product" to constitute a physical loss. She concluded the "[f]ailure to immediately pass through [c]ustom[s] inspections pursuant to government safety regulations, and oversight as to the quality of the masks, is not a physical loss." The policies did not cover "diminution in value

10

from [c]ustoms' detainment" because plaintiffs were not "permanently denied complete and total 'access to property' confiscated for government use, or damage from an incident at the building or structure site . . . ." Indeed, the masks were eventually released by authorities, and plaintiffs "relabeled a portion, sent back a portion to China, and destroyed a portion to mitigate storage costs when defendant declined coverage."

II.

On appeal, plaintiffs argue the motion judge erred in finding no physical loss due to the government's seizure of the masks. They repeat that defendant's policies covered against "all risks of physical loss or damage . . . from any external cause" and did not exclude governmental seizure.

Plaintiffs dispute the judge's conclusion the masks were not damaged and argue she ignored the damages evidence in the record. They claim the judge focused on the fact the goods were lawfully detained, yet the policies made no distinction between lawful and unlawful seizures. Moreover, the policies here were different than Mac Property because the policy in that case covered "direct physical loss or damage"—language that is more circumscribed than the broader policy language employed here, which covered losses due to customs inspections and risks in customs. The policies here also offered coverage in the

11

event of detriment, hurt, or damage, which the judge failed to consider. They also assert the judge ignored evidence the masks could still be sold as face coverings but for the seizure, and that the detention resulting in a diminution in value constituted a loss.

Plaintiffs argue the judge erred by considering extrinsic evidence to conclude they were aware during the policy procurement period that customs could seize the masks due to their lack of efficacy. They assert what they knew and their intent were material disputed facts the court could not resolve on summary judgment.

We review a decision granting or denying summary judgment de novo, applying the same legal standard under Rule 4:46-2 as the trial court. Schwartz v. Menas, 251 N.J. 556, 570 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "To decide whether a genuine issue of material fact exists, [we] must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472

(2020) (second alteration in original) (quoting <u>Globe Motor Co. v. Igdalev</u>, 225 N.J. 469, 480 (2016)).

"An insurance policy is a contract." <u>Villa v. Short</u>, 195 N.J. 15, 23 (2008). A trial court's interpretation of an insurance contract is a question of law, which we also review de novo. <u>Polarome Int'l, Inc. v. Greenwich Ins. Co.</u>, 404 N.J. Super. 241, 260 (App. Div. 2008). When "interpreting insurance contracts, we first examine the plain language of the policy and, if the terms are clear, they 'are to be given their plain, ordinary meaning.'" <u>Pizzullo v. N.J. Mfrs. Ins. Co.</u>, 196 N.J. 251, 270 (2008) (quoting <u>Zacarias v. Allstate Ins. Co.</u>, 168 N.J. 590, 595 (2001)). The policy must "be enforced as written when its terms are clear" so the "expectations of the parties will be fulfilled." <u>Flomerfelt v. Cardiello</u>, 202 N.J. 432, 441 (2010).

If an insurance policy is ambiguous, we will construe the terms "in favor of the insured." <u>Mac Prop.</u>, 473 N.J. Super. at 18 (quoting <u>Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co.</u>, 229 N.J. 196, 208 (2017)). However, this doctrine only applies if there is a genuine ambiguity in the contract, and "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage . . . ." <u>Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh</u>, 224 N.J. 189, 200

(2016) (quoting <u>Progressive Cas. Ins. Co. v. Hurley</u>, 166 N.J. 260, 274 (2001)). "When the terms of an insurance contract are clear, it is the function of a court to enforce it as written and not to make a better contract for either of the parties." <u>Kampf v. Franklin Life Ins. Co.</u>, 33 N.J. 36, 43 (1960).

At the outset, and contrary to plaintiffs' assertions, the judge's decision did not turn on whether the government action was "lawful." There is no evidence in the record customs authorities acted unlawfully, and the judge's characterization of the government's action as lawful was merely a word choice that is not dispositive of the issue before us.

The central issue is whether the detention of the masks by customs authorities constituted a "physical loss or damage" to the masks. Our review of the plain language of the policy does not convince us it was ambiguous. We are not persuaded that the terms "physical loss or damage" included the detention of the masks for inspection by customs authorities or the fact that they were determined not to meet N95 standards. The reduced efficiency of the masks was discovered by customs' testing but was not created by the detention. The manufacturers are potentially to blame for the diminished utility of the masks; an issue that is not before us and being litigated elsewhere. And the detention itself did not constitute a physical loss or damage because the masks were

temporarily unavailable during their inspections, which neither constituted a loss, nor damage.

Construing the policies in the manner argued by plaintiffs would lead to an absurd result, such as obligating coverage for a delay of any time-period plaintiffs were without the masks. A plain reading of the policies convinces us the masks had to be damaged, lost, or altered in some way to constitute a physical loss or damage covered by the policy.

Plaintiffs rely upon Customized Distribution Services v. Zurich Insurance Company, 373 N.J. Super. 480 (App. Div. 2004) and Wakefern Food Corporation v. Liberty Mutual Fire Insurance Company, 406 N.J. Super. 524 (App. Div. 2009) to support their conception of "physical loss." The claim in Customized Distribution arose from the improper rotation of a beverage on behalf of Campbell Soup Company, which caused shipments of the beverage to occur too close to their expiration date, forcing Campbell to dispose of the mishandled beverages at reduced prices. 373 N.J. Super. at 483-84. Although there was no change in the material composition of the beverage, we concluded the mishandling of its rotation was

> the functional equivalent of damage of a material nature or an alteration in physical composition. By reason of this change, and of the ensuing new perception of the covered property and its nature, the product lost value

A-3905-21

> as much from the outdating as if it had turned sour or gone bad in some more tangible or material way.
>
> [Id. at 490.]

Customized Distribution is clearly distinguishable because the masks did not have an expiration date that could be tied to their value to the insured. Moreover, nothing happened to the masks during customs inspections to reduce their value. The masks did not meet their intended purpose before they were shipped.

Wakefern is likewise inapposite. There, the plaintiffs operated a group of supermarkets, which lost food due to spoilage during a four-day electrical blackout. 406 N.J. Super. at 528. The Wakefern policies covered "consequential loss or damage resulting from an interruption of electrical power to plaintiffs' supermarkets" if that interruption follows "'physical damage" to specified electrical equipment. Id. at 530. The insurer, however, denied coverage, contending that although the power grid was incapable of supplying power for four days, the electrical equipment suffered no "physical damage." Id. at 529.

We held the term "physical damage," in the context of the insurance policy at issue, was ambiguous because it was susceptible to two interpretations. Id. at 540-41. Therefore, plaintiffs were entitled to their lost revenue because "due to

16

a physical incident or series of incidents" elsewhere, the entire grid had become "physically incapable of performing [its] essential function . . . ." Id. at 540. The "loss of functionality" rather than harm to the property's structure equated with a "physical loss of or damage to" the insured property. Id. at 543. Notably, we added that we would have "reach[ed] a different result if, for example, a governmental agency had ordered that the power [to the supermarket] be shut off to conserve electricity." Id. at 540 n.7.

Again, the policy here was not ambiguous. More importantly, the detention of the masks by customs did not cause them to lose functionality given the improper manufacture of the masks from the onset. The detention did not physically alter the masks' condition like the way in which the loss of power caused the food to spoil in Wakefern.

Recently, in Mac Property we held that business losses due to government closure orders barring or curtailing plaintiffs' operations during the COVID-19 pandemic did not meet the policy's definition of a "direct physical loss of or damage to" their insured property. 473 N.J. Super. at 10. The Mac Property policy was not ambiguous and was "not so confusing that average policyholders like plaintiffs could not understand that coverage extended only to instances where the insured property has suffered a detrimental physical alteration of some

17

kind, or there was a physical loss of the insured property." Id. at 21-22. We reasoned that when "'physical' is paired with another word, such as in 'physical injury,' we have found that the resulting term means a 'detrimental alteration[],' or 'damage or harm to the physical condition of a thing.'" Id. at 20 (alteration in original) (quoting Phibro Animal Health Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 446 N.J. Super. 419, 437 (App. Div. 2016)).

In Phibro, we addressed an argument similar to the one plaintiffs raise here regarding the diminution value of the property to the insured. 446 N.J. Super. 419 (App. Div. 2016). Phibro sold an additive for chicken feed designed to prevent a parasitic disease. Id. at 424. Although the additive successfully prevented disease in the chickens, Phibro's customers reported it "stunted the growth of their chickens . . . result[ing] in lower meat production, increased feed costs, and increased processing costs." Id. at 424-25. Although the chickens were salable, they were "not at the sizes normally anticipated." Id. at 425.

The Phibro policies provided coverage for "property damage" and defined it "as '[p]hysical injury to tangible property, including all resulting loss of use of that property' or, alternatively, '[l]oss of use of tangible property that is not physically injured.'" Id. at 436 (alterations in original). Phibro filed a notice of claim with its carrier regarding its "potential liability for customer claims . . . ."

A-3905-21

Id. at 425. The insurers denied coverage. Id. at 425-26. Phibro sued for a declaratory judgment that its primary insurer was obligated to provide coverage. Id. at 426. Following competing motions for summary judgment from Phibro and the insurer, the trial court denied Phibro's motion and granted the insurer summary judgment. Id. at 427. The trial court reasoned the property damage provision of the policy did not apply because the chickens were not physically damaged and were sold for human consumption. Ibid.

We reversed in Phibro, concluding the chickens' stunted growth qualified as a physical injury. Id. at 438. We stated: "Undoubtedly, the undisputed smaller sizes of the broiler chickens could be considered an alteration . . . . Simply stated, stunted growth represents harm to the physical condition of the chickens." Id. at 438. The fact the chickens were salable was "not dispositive of whether there was property damage . . . [because] the policies [did] not require that the property that is damaged be unsalable." Id. at 439. We also held the chickens' stunted growth "resulted in a partial loss of their use, which independently qualifie[d] as 'property damage.'" Id. at 442.

Again, Phibro is distinguishable because the chickens were physically altered and here, the masks were not. The fact the masks lost value as face coverings during their detention in customs is not analogous to the chickens' loss

19

of value because the loss in value was not based in the physical damage, alteration, or modification of the masks, whereas the physically stunted growth of the chickens caused their loss in value. Here, the plain language of the policy insured physical loss and damage to the masks; in other words, an adverse effect on the corporeal and tangible nature of the masks, which simply did not occur. For these reasons, the motion judge properly granted defendant summary judgment.

Finally, although we part ways with defendant's assertion on appeal that the judge's ruling was not predicated on findings regarding plaintiffs' awareness of the risk the masks could be seized during the policy procurement period, and extrinsic evidence, including the texts with the manufacturer and emails with the broker, this does not warrant a reversal. This is because the motion judge's opinion makes clear summary judgment in defendants' favor also rested on the independent grounds of interpreting the policy. Our de novo review of the record confirms summary judgment was properly granted based on the interpretation of the policy language alone. Therefore, we do not reach these additional arguments by defendants as they are not dispositive.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

20

A-3905-21