NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.  A-0714-20
               A-0962-20
               A-1034-20
               A-1110-20
               A-1111-20
               A-1148-20

MAC PROPERTY GROUP LLC
& THE CAKE BOUTIQUE LLC,

      Plaintiff-Appellant,

v.

SELECTIVE FIRE AND
CASUALTY INSURANCE
COMPANY,

      Defendant-Respondent.

_____

PRECIOUS TREASURES LLC,

      Plaintiff-Appellant,

v.

MARKEL INSURANCE
COMPANY,

      Defendant-Respondent.

_____

FAFB, LLC (d/b/a SALTED
LIME BAR & KITCHEN),

> **APPROVED FOR PUBLICATION**
>
> **June 20, 2022**
>
> **APPELLATE DIVISION**

Plaintiff-Appellant,

v.

BLACKBOARD INSURANCE COMPANY,

Defendant-Respondent.
_____

COUNTRY DINER OF MULLICA HILL, INC. d/b/a HARRISON HOUSE,

Plaintiff-Appellant,

v.

WESCO INSURANCE COMPANY

Defendants-Respondents,

and

AMTRUST FINANCIAL SERVICES, INC.,

Defendants.
_____

PEARL THREE TWO LLC d/b/a ROUTE 40 DINER,

Plaintiff-Appellant,

v.

WESCO INSURANCE COMPANY

Defendants-Respondents,

and

AMTRUST FINANCIAL
SERVICES, INC.,

Defendants.

_____

MATTDOGG, INC. (d/b/a
PURE FOCUS SPORTS CLUB),

Plaintiff-Appellant,

v.

PHILADELPHIA INDEMNITY
INSURANCE COMPANY,

Defendant-Respondent.

_____

Argued (A-0962-20, A-1034-20 and A-1148-20) and
Submitted (A-0714-20, A-1110-20 and A-1111-20)
May 9, 2022 — Decided June 20, 2022

Before Judges Sumners, Vernoia, and Firko.

On appeal from the Superior Court of New Jersey, Law
Division, Camden County, Docket Nos. L-2629-20,
L-2630-20, L-2631-20, and L-2690-20, and Mercer
County, Docket Nos. L-0820-20 and L-0892-20.

Ashley S. Nechemia argued the cause for appellant
Precious Treasures, LLC, (Mattleman Weinroth &
Miller, PC, attorneys; Robert W. Williams, on the
briefs).

Kevin J. Kotch argued for the cause for appellants FAFB, LLC and Mattdogg, Inc. (Ferrara Law Group, PC, attorneys; Ralph P. Ferrara and Kevin J. Kotch, of counsel and on the briefs).

Mattleman, Weinroth & Miller, PC, attorneys for appellants MAC Property Group, LLC & The Cake Boutique, LLC, Country Diner of Mullica Hill, Inc., and Pearl Three Two, LLC, (Robert W. Williams, on the briefs).

Bennett Evan Cooper (Dickinson Wright PLLC) of the Arizona and California bars, admitted pro hac vice, argued the cause for respondent Markel Insurance Company (Bennett Evan Cooper, Timothy M. Strong (Dickinson Wright PLLC) of the Arizona bar, admitted pro hac vice, and Peter E. Doyle (Dickinson Wright PLLC), attorneys; Bennett Evan Cooper, Timothy M. Strong and Peter E. Doyle, on the brief).

Keith Moskowitz (Dentons US LLP) of the Connecticut, Illinois and New York bars, admitted pro hac vice, argued for respondent Blackboard Insurance Company (Dentons US LLP, attorneys; Shawn L. Kelly, Kelly Lloyd Lankford, and Keith Moskowitz, on the brief).

Stephen E. Goldman (Robinson & Cole LLP) of the Connecticut bar, admitted pro hac vice, argued the cause for respondent Philadelphia Indemnity Insurance Company (Walsh Pizzi O'Reilly Falanga LLP, and Dentons US LLP, attorneys; John R. Vales, Stephen M. Turner and Jeffrey A. Zachman (Dentons US LLP) of the Georgia bar, admitted pro hac vice, on the brief).

A-0714-20

4

Day Pitney LLP, attorneys for respondent Selective Fire and Casualty Insurance Company (Elizabeth J. Sher and Joseph K. Scully, on the brief).

Dilworth Paxson, LLP, attorneys for respondent Wesco Insurance Company (Thomas E. Hastings and Richard J. Orr, of counsel and on the briefs).

The opinion of the court was delivered by

SUMNERS, JR., J.A.D.

These six back-to-back appeals arising from Law Division orders in two vicinages have been consolidated for the issuance of a single opinion. They require us to consider an issue of first impression—whether in the context of Rule 4:6-2(e) motions to dismiss with prejudice, insurance policies issued by defendants did not cover business losses incurred by plaintiffs that were forced to close or limit their operations as a result of Executive Orders (EOs) issued by Governor Philip Murphy to curb the COVID-19 global health crisis.

Plaintiffs Pearl Three Two, LLC d/b/a Route 40 Diner (Pearl), Precious Treasures, and Mac Property Group, LLC & The Cake Boutique, LLC (MPG) each sued their respective defendant insurance companies, Wesco Insurance Company (Wesco), Amtrust Financial Services, Inc. (Amtrust), Markel Insurance Company (Markel), and Selective Fire and Casualty Insurance Company (Selective), alleging breach of contract by refusing to cover plaintiffs'

A-0714-20

5

insurance claims for business losses they sustained due to the EOs. Plaintiffs Mattdogg, Inc. d/b/a/ Pure Focus Sports (Mattdogg) and FAFB, LLC d/b/a Salted Lime & Kitchen (FAFB) sued defendants Blackboard Insurance Company (Blackboard) and Philadelphia Indemnity Insurance Company (Philadelphia Indemnity) seeking declaratory judgments requiring payment of plaintiffs' business loss claims sustained due to the EOs.

We affirm because we conclude the motion judges were correct in granting Rule 4:6-2(e) dismissals of plaintiffs' complaints with prejudice for failure to state a claim on the basis that plaintiffs' business losses were not related to any "direct physical loss of or damage to" covered properties as required by the terms of their insurance policies. We conclude plaintiffs' business losses were also not covered under their insurance policies' civil authority clauses, which provided coverage for losses sustained from governmental actions forcing closure or limiting business operations under certain circumstances. We further conclude defendants' denial of coverage was not barred by regulatory estoppel. In the alternative, we conclude that even if plaintiffs' business losses otherwise satisfied the requirements of the relevant clauses, coverage was barred by their insurance policies' virus exclusions and endorsements because the EOs were a direct result of COVID-19.

A-0714-20

6

I.

We begin with a brief discussion of the events and procedural postures precipitating these appeals.

A. Executive Orders

On January 30, 2020, the World Health Organization (WHO) declared the COVID-19 outbreak to be "a Public Health Emergency of International Concern" that would require "a global coordinated effort." The next day, the Secretary of the United States Department of Health and Human Services declared a public health emergency for the nation in response to COVID-19.

On March 9, Governor Murphy issued EO 103 in response to the COVID-19 outbreak, which was spreading globally, including in the United States. Exec. Order No. 103 (Mar. 9, 2020), 52 N.J.R. 549(a) (Apr. 6, 2020). The EO stated COVID-19 "is a contagious, and at times fatal, respiratory disease caused by the SARS-CoV-2 virus," with symptoms including "fever, cough, and shortness of breath." Ibid. The order explained that the disease "can spread from person to person via respiratory droplets." Ibid. EO 103 also stated the Center for Disease Control (CDC) "expect[ed] that additional cases of COVID-19 [would] be identified in the coming days . . . and that person-to-person spread [was] likely to continue to occur." Ibid. Accordingly,

Governor Murphy declared a "Public Health Emergency and State of Emergency . . . in the State of New Jersey" and directed several State agencies and officials to take action to protect "the health, safety and welfare" of New Jersey citizens from the virus outbreak. Ibid.

On March 16, to "mitigate [the] community spread" of the disease, Governor Murphy issued EO 104, which "limit[ed] the unnecessary movement of individuals in and around their communities and person-to-person interactions in accordance with CDC and DOH guidance"; designated a subset of businesses within the state as "essential"; and limited the scope of service and hours of operation for restaurants and some retail establishments. Exec. Order No. 104 (Mar. 16, 2020), 52 N.J.R. 550(a) (Apr. 6, 2020). Five days later, on March 21, due to the increase of confirmed COVID-19 cases nationally and in our state, and based upon the CDC's advice, EO 107 was issued, which "established statewide social mitigation strategies for combatting COVID-19," including further limiting social gatherings and requiring that all brick-and-mortar premises of "non-essential" businesses remain "close[d] to the public" for as long as the order remained in effect. Exec. Order No. 107 (Mar. 21, 2020), 52 N.J.R. 554(a) (Apr. 6, 2020). Specific to plaintiffs, the order required that: (1) "All recreational and entertainment businesses" close to the public, including

a non-exhaustive list of such businesses such as "gyms and fitness centers and classes;" (2) "[a]ll public, private, and parochial preschool program premises, and elementary and secondary schools, including charter and renaissance schools" remain "closed to students" for the duration of the order; and (3) restaurants and other "dining establishments" were "permitted to operate their normal business hours," but were "limited to offering only food delivery and/or take-out services." Ibid. EO 107 concluded by stating it was "the duty of every person or entity in this State or doing business in this State . . . to cooperate fully in all matters concerning this Executive Order."[1] Ibid.

B. Parties' Complaints & Dismissals

Mattdogg owns and operates a full-service, twenty-four-hour gym, Pure Focus Sports Club, in Brick, which was forced to close due to the EOs. In anticipation of seeking insurance coverage for its business losses, Mattdogg filed a declaratory judgment complaint in Mercer County against Philadelphia Indemnity, which insured the gym from November 15, 2019 to November 15, 2020. Mattdogg alleged that because of the EOs, it was "forced to close its business to the public," causing a loss of income. It stated that the EOs

---

[1] The order went into effect on March 21, 2020, at 9:00 p.m.

A-0714-20

9

"physically impact[ed]" it, and that "[a]ny effort by Philadelphia Indemnity to deny" coverage under its policy "would constitute a false and potentially fraudulent misrepresentation that could endanger [Mattdogg] and the public." Mattdogg stated that to its knowledge, no employee or patron of its gym had been "diagnosed with COVID-19." Mattdogg did not state that it had submitted a claim for coverage to Philadelphia Indemnity related to its losses. The complaint was dismissed with prejudice when the motion judge granted Philadelphia Indemnity's Rule 4:6-2(e) motion to dismiss for failure to state a claim based on the determination that Mattdogg's business losses were not covered under the insurance policy.

FAFB owns and operates a restaurant and bar, Salted Lime Bar & Kitchen, in Somerville, which was forced to close its dine-in services due to the EOs but was still able to offer food and beverage for takeout during limited hours.[2] In anticipation of seeking insurance coverage for its business losses, FAFB filed a declaratory judgment complaint in Mercer County against Blackboard, which insured the restaurant and bar from November 6, 2019 to November 6, 2020. FAFB alleged the EOs were "physically impacting" it and that "[a]ny effort by

---

[2] The record is unclear as to whether FAFB ceased all its restaurant business operations.

A-0714-20

10

Blackboard to deny" coverage under its insurance policy for its financial losses "would constitute a false and potentially fraudulent misrepresentation that could endanger [FAFB] and the public."

FAFB specifically stated that to its knowledge, no employee or patron of its restaurant and bar had been "diagnosed with COVID-19," and that it was "not seeking a determination of whether [COVID-19] was present in its business." FAFB's complaint did not allege it had submitted a claim to Blackboard. The complaint was dismissed with prejudice when the motion judge granted Blackboard's Rule 4:6-2(e) motion to dismiss based on the determination that FAFB's business losses were not covered under the insurance policy.

Precious Treasures owns and operates Lil' Big Ones Child Care & Learning Center (Center) in South Plainfield—offering day care programs for infants to pre-kindergarten aged children, after-school care, and homework assistance—and was forced to close due to the EOs. When Precious Treasures's claim for its business losses was denied by defendant Markel, which insured the Center from August 30, 2019 to August 30, 2020, it filed a complaint in Camden County claiming breach of contract and seeking declaratory judgment. Precious Treasures alleged that it "suffered a direct physical loss of and damage to its property" because it was "unable to use its property for its intended purpose." It

maintained that its losses of revenue during the effective period of the EOs were covered under its insurance policy's business income and civil authority clauses. The complaint was dismissed with prejudice when the motion judge granted Markel's <u>Rule</u> 4:6-2(e) motion to dismiss based on the determination that Precious Treasures's business losses were not covered under the insurance policy.

Country Diner owns and operates a restaurant, Harrison House, in Mullica Hill, which was forced to close its dine-in services due to the EOs but was still able to offer food and beverage for takeout during limited hours.[3] After Country Diner's claim for its business losses was denied by Wesco, which covered the restaurant from October 21, 2019 to October 21, 2020, it filed a complaint in Camden County against Wesco and insurance provider AmTrust claiming breach of contract and seeking declaratory judgment. Country Diner alleged: (1) as a result of the EOs it was "required to suspend . . . its operations" at its restaurant; (2) it "suffered a direct physical loss of and damage to its property" because it was "unable to use its property for its intended purpose," causing financial losses; and (3) these losses were covered under its insurance policy's

---

[3] The record is unclear as to whether Country Diner ceased all its restaurant business operations.

business income and civil authority clauses. The complaint was dismissed with prejudice when the motion judge granted Wesco's and AmTrust's Rule 4:6-2(e) motion to dismiss based on the determination that Country Diner's business losses were not covered under the insurance policy.

Pearl owns and operates a restaurant, Route 40 Diner, in Monroeville, which was forced to close its dine-in services due to the EOs but was still able to offer food and beverage for takeout during limited hours.[4] After Pearl's claim for its business losses was denied by its insurer Wesco, which covered the restaurant from February 22, 2020, to February 22, 2021, it filed a breach of contract complaint in Camden County against Wesco and insurance provider AmTrust. Pearl, which had the same insurer, insurance provider, and counsel as Country Diner, reiterated the same allegations as Country Diner did in its complaint. Its complaint was also dismissed with prejudice when the motion judge granted Wesco and AmTrust's Rule 4:6-2(e) motion to dismiss based on the determination that Pearl's business losses were not covered under the insurance policy.

---

[4] The record is unclear as to whether Pearl ceased all its restaurant business operations.

MPG owns and operates The Cake Boutique—which sells cakes and other baked goods for dining-in and at various events, as well as offers on-site decorating classes and parties—and was forced to close its on-site services due to the EOs.  After MPG's claim for its business losses was denied by its insurer Selective, which covered the restaurant in two separate but similar polices from April 28, 2019 through April 28, 2022, MPG filed a breach of contract complaint in Camden County against Selective.  The complaint stated that EOs 103 and 107 declared a state of emergency in New Jersey and required residents "to remain home or at their place of residence subject only to certain limited exceptions."  MPG averred that "[a]s a result of" these "[g]overnmental [a]ctions," it was "required to suspend its operations" at The Cake Boutique.[5] MPG alleged that it "suffered a direct physical loss of and damage to its property" under its insurance policy "because it has been unable to use its property for its intended purpose."  It claimed that this loss was covered under the policy's business income and civil authority clauses.  The complaint was dismissed with prejudice when the motion judge granted Selective's Rule 4:6-

---

[5]  The record does not disclose whether MPG ceased all business at the bakery or only stopped offering on-premises dining, events, celebrations, and classes.

2(e) motion to dismiss based on the determination that MPG's business losses were not covered under the insurance policy.

II.

A. Rule 4:6-2(e) Standard

Plaintiffs contend the motion judges erred by dismissing their complaints with prejudice under Rule 4:6-2(e). Our review of a trial judge's order on a Rule 4:6-2(e) motion to dismiss a complaint is de novo, Watson v. New Jersey Dep't of Treasury, 453 N.J. Super. 42, 47 (App. Div. 2017), and, thus, "we owe no deference to the . . . judge's conclusions," State ex rel. Comm'r of Transp. v. Cherry Hill Mitsubishi, Inc., 439 N.J. Super. 462, 467 (App. Div. 2015). In deciding whether to grant dismissal, the complaint's allegations are accepted as true and with all favorable inferences accorded to plaintiff. Watson, 453 N.J. Super. at 47. "A complaint should be dismissed for failure to state a claim pursuant to Rule 4:6-2(e) only if 'the factual allegations are palpably insufficient to support a claim upon which relief can be granted.'" Frederick v. Smith, 416 N.J. Super. 594, 597 (App. Div. 2010). A plaintiff's opposition to a motion to dismiss is "not to prove the case" but only to show that the complaint contains "allegations which, if proven, would constitute a valid cause of action." Leon v. Rite Aid Corp., 340 N.J. Super. 462, 472 (App. Div. 2001). In limiting our

inquiry "to examining the legal sufficiency of the facts alleged on the face of the complaint," Green v. Morgan Prop., 215 N.J. 431, 451 (2013) (internal quotation marks omitted), the complaint is "search[ed] . . . in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim," Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989) (internal quotation marks omitted).

Dismissals under Rule 4:6-2(e) are ordinarily without prejudice. See id. at 772; Pressler & Verniero, Current N.J. Court Rules, cmt. 4.1.1 on R. 4:6-2(e) (2020). Yet, a dismissal with prejudice is "mandated where the factual allegations are palpably insufficient to support a claim upon which relief can be granted," Rieder v. State, 221 N.J. Super. 547, 552 (App. Div. 1987), or if "discovery will not give rise to such a claim," Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman and Stahl, P.C., 237 N.J. 91, 107 (2019).

B. Interpretation of Insurance Policies

Dismissal of plaintiffs' complaints involved questions of contractual interpretation: whether defendants' insurance policies covered plaintiffs' claimed or future losses as a result of plaintiffs' inability to operate or the limitations of their businesses following the issuance of the EOs. Our rules regarding interpretation of insurance contracts are well-settled. "In interpreting

insurance contracts, we first examine the plain language of the policy and, if the terms are clear, they 'are to be given their plain, ordinary meaning.'" Pizzullo v. N.J. Mfrs. Ins. Co., 196 N.J. 251, 270 (2008) (quoting Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001)). Thus, an undefined policy term or word "must be interpreted in accordance with [its] ordinary, plain and usual meaning." Daus v. Marble, 270 N.J. Super. 241, 251 (App. Div. 1994).

A policy's language that is "direct and ordinary" is not ambiguous when it can "be understood without employing subtle or legalistic distinctions," is not "obscured by fine print," and does not "require[] strenuous study to comprehend." Zacarias, 168 N.J. at 601. See Katchen v. Gov't Emps. Ins. Co., 457 N.J. Super 600, 606 (App. Div. 2019) (holding an insurer "could have included a definition of 'motor vehicle' in its policy," but the term was not ambiguous simply because a definition was missing, since "any ordinary reasonable person understands" its meaning). We "should not 'engage in a strained construction to support the imposition of liability' or write a better policy for the insured than the one purchased." Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008) (quoting Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 272-73 (2001)).

If the insurance policy's terms are ambiguous, courts will ordinarily "construe . . . ambiguities in favor of the insured via the doctrine of contra proferentem." Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co., 229 N.J. 196, 208 (2017). This doctrine recognizes "the vast differences in the bargaining positions between an insured and an insurance company in the drafting of an insurance policy," allowing interpretation of a contract against the insurer drafter, Villa v. Short, 195 N.J. 15, 23 (2008), by utilizing rules of construction outside the contract's four corners, Oxford Realty, 229 N.J. at 208.

Insurance policies are very often contracts of adhesion, thus, "courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175 (1992). Hence, a policy should be "construed liberally" in the insured's favor "to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.'" Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 482 (1961) (quoting Danek v. Hommer, 28 N.J. Super. 68, 76 (App. Div. 1953)). Nevertheless, only where there is a "genuine ambiguity" in the policy or "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage" does public policy influence a court's

interpretation.  Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburg, 224 N.J. 189, 200 (2016).

An "insured's reasonable expectations should not be considered where the policy is plain in its meaning unless the policy is 'inconsistent with public expectations [and] commercially accepted standards.'"  Nunn v. Franklin Mut. Ins. Co., 274 N.J. Super 543, 550 (App. Div. 1994) (alteration in original) (quoting Werner Indus., Inc. v. First State Ins. Co., 112 N.J. 30, 36 (1988)).  Generally, "the basic notion [is] that the premium paid by the insured does not buy coverage for all . . . damage but only for that type of damage provided for in the policy."  Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 237 (1979).  Accordingly, an insurance policy may contain limitations on coverage "designed 'to restrict and shape the coverage otherwise afforded.'"  Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 102 (2009) (quoting Weedo, 81 N.J. at 237).

III.

Guided by the above principles, we examine the pertinent provisions of the parties' insurance policies and address plaintiffs' arguments.  Except for Pearl and Country Diner who were insured by Wesco, the other plaintiffs had different insurers.  However, excluding a few minor differences as discussed below, the relevant provisions of the insurance policies are essentially identical.

## A. Direct Physical Loss Of Or Damage To Covered Property

The insurance policies obligated defendants to "pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss," as well as "pay for the actual loss of Business Income [plaintiffs] sustain due to the necessary 'suspension' of [plaintiffs'] 'operations' during the 'period of restoration.'" "Business Income" was defined as "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred" if the physical loss or damage had not occurred and "[c]ontinuing normal operating expenses incurred, including payroll." "Period of restoration" was defined as the period of time beginning after the "physical loss or damage" that was "caused by or resulting from any Covered Cause of Loss" and ending on the date when the property "should be repaired, rebuilt or replaced with reasonable speed and similar quality."

To trigger business income coverage, "[t]he 'suspension' must be caused by direct physical loss of or damage" to plaintiffs' covered premises and "[t]he loss or damage must be caused by or result from a Covered Cause of Loss." "Covered Causes of Loss" was defined as "direct physical loss unless the loss is

excluded or limited" in the policies, but the policies did not define "physical loss" and "physical damage."

The insurance policies also contained "Civil Authority" sections, stating defendants would "pay for the actual loss of Business Income" plaintiffs sustained "caused by action of civil authority that prohibits access to" its premises. To trigger coverage, the action of the civil authority needed to be taken "as a result of the damage" to nearby property, and either "in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage" or "to enable a civil authority to have unimpeded access to the damaged property." (Ibid.)

The motion judges all agreed with defendants' arguments that the insurance policies did not cover plaintiffs' business losses because the suspension of their businesses due to the EOs was not a "direct physical loss of or damage to" their insured premises. Because the policies do not define the term, we look to the term's plain meaning. Pizzullo, 196 N.J. at 270; Daus, 270 N.J. Super. at 251.

Our courts have "adopted a broad notion of the term 'physical.'" Phibro Animal Health Corp. v. Nat'l Union Fire Ins. Co., 446 N.J. Super 419, 437 (App. Div. 2016). When, however, "physical" is paired with another word, such as in

"physical injury," we have found that the resulting term means a "detrimental alteration[]," or "damage or harm to the physical condition of a thing." Id. at 438 (quoting Farm Bureau Mut. Ins. Co. of Am. v. Earthsoils, Inc., 812 N.W.2d 873, 876 (Minn. Ct. App. 2012)).

In Wakefern Food Corp. v. Liberty Mutual Fire Insurance Co., this court determined "the undefined term 'physical damage'" in the plaintiff supermarket's insurance policy was "ambiguous" and should not have been interpreted "in a manner favoring the insurer and inconsistent with the reasonable expectations of the insured." 406 N.J. Super. 524, 540 (App. Div. 2009). In that case, a power outage at the supermarket occurred when an electrical "cascade" disrupted a large part of the nation's power grid. Id. at 532-38. We held plaintiff was entitled to its lost revenue under its insurance policy, which covered "consequential loss or damage resulting from interruption of" electrical power at its premises if the interruption resulted from "physical damage" to electrical equipment and property located elsewhere. Id. at 531-32.

We concluded "physical damage" was ambiguous because it was susceptible to "at least two different reasonable interpretations": (1) the part of the electric grid serving the supermarket was not damaged because there was no detrimental alteration to its structure; or (2) the electric grid was damaged

because it was shut down due to the cascade elsewhere, rendering it physically incapable of providing electricity. Id. at 540-41. Given this ambiguity, the term should have been construed in the plaintiff's favor, since "due to a physical incident or series of incidents" elsewhere, the entire grid had become "physically incapable of performing [its] essential function." Id. at 540.

We explained that the average policyholder should not be "expected to understand the arcane functioning of the power grid" when submitting an insurance claim after a power outage. Id. at 541. We did, however, recognize that we would have "reach[ed] a different result if, for example, a governmental agency had ordered that the power [to the supermarket] be shut off to conserve electricity." Id. at 540 n.7.

We disagree with plaintiffs' contention that the term "direct physical loss of or damage to," as set forth in their insurance policies, is ambiguous. The term was not so confusing that average policyholders like plaintiffs could not understand that coverage extended only to instances where the insured property has suffered a detrimental physical alteration of some kind, or there was a physical loss of the insured property.

The policies' business income coverage, which is explicitly provided only during a "period of restoration," supports our conclusion. The "period of

restoration" is defined in the policies as beginning either at the time the physical loss or damage occurred or some number of hours later and ending at the time when business operations resumed at another permanent location, or when the insured premises "should be repaired, rebuilt or replaced with reasonable speed and similar quality."  This definition clarifies the intended meaning of "direct physical loss" and "direct physical damage" as contemplated by the parties in their contract.  Finding coverage where there has been no physical damage to property that would require repairs, rebuilding, or replacement would render the "period of restoration" language in the contracts "meaningless."  Port Murray Dairy Co. v. Providence Washington Insurance Co., 52 N.J. Super. 350, 357 (Ch. Div. 1958).

Our interpretation is consistent with the sound reasoning set forth in Port Murray Dairy.  There, striking workers blockaded the entrances to the plaintiff's dairy plant, hindering its operations but not damaging or destroying any of the plaintiff's buildings or equipment.  Id. at 353-54.  Undelivered milk inside the plant deteriorated, causing a loss of revenue.  Ibid.  The plaintiff's insurance policy stated that in the event of "damage" from perils insured against, including "riot attending a strike," the defendant insurer would pay for expenses incurred "to continue the normal conduct of the insured's business during the period of

A-0714-20

24

restoration." Id. at 356. The court held the plaintiff's business losses were not covered, reasoning that the policy "obviously refer[red] to a situation where the insured's property . . . has been damaged or destroyed." Id. at 357. Further, the term "period of restoration," defined as the time required to repair, rebuild, or replace any part of the property that had been destroyed or damaged, would be "meaningless" if the plaintiff were allowed to recover for purely economic losses in the absence of any such damage or destruction.[6] Ibid.

Here, there was no damage to plaintiffs' equipment or property on or off-site that caused their premises to lose their physical capacity to operate, and there was no physical alteration that made their premises dangerous to enter. More specifically, no plaintiff alleges the coronavirus was present on their properties or rendered their properties uninhabitable. Instead, plaintiffs' businesses were shut down or had their operations limited by the EOs. Each plaintiff would have been able to continue functioning as a dine-in restaurant, bakery, childcare and learning center, or gym without interruption had Governor

---

[6] In Kieffer v. High Point Ins. Co., 422 N.J. Super. 38, 45 (App. Div. 2011), this court quoted the Texas Court of Appeals' decision in Carlton v. Trinity Universal Insr. Co., 32 S.W.3d 454, 464 (Tex. App. 2000), which held: "In common usage, 'repair' means 'to restore by replacing a part or putting together what is torn or broken' or, stated slightly differently, 'to bring back to good or usable condition.'"

Murphy not issued his EOs. None of plaintiffs' premises required any repairs due to damage, nor needed to be relocated and then reopened once the EOs' effective period ended.

Recently, the Seventh Circuit Court of Appeals and the Massachusetts Supreme Court have affirmed motions dismissing with prejudice complaints by insured businesses seeking business losses due to COVID-19 governmental shutdowns under their insurance general liability policies. In East Coast Entertainment of Durham, LLC v. Houston Casualty Co., plaintiff East Coast Entertainment of Durham, LLC (ECE) was forced to shut down its movie theaters throughout North Carolina due to the imposition of statewide closures in response to the COVID-19 pandemic. 31 F.4th 547, 549 (7th Cir. 2022). ECE's insurance policy was essentially the same as plaintiffs' insurance policies. ECE's policy contained a "Business Income" coverage provision, which stated,

> [w]e will pay the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at premises that are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damages must be caused by or result from a Covered Cause of Loss.
>
> [Ibid.]

The policy defined the "period of restoration" as "the period between 'the date of direct physical loss or damage to the property' and either '[t]he date when the property should be repaired, rebuilt or replaced with reasonable speed and similar quality' or 'when business is resumed at a new permanent location,' whichever occurs first." Ibid. (alteration in original).

The Seventh Circuit affirmed the federal district court's dismissal of the plaintiff's suit for declaratory relief and damages for the denial of its insurance claims regarding its losses during the COVID-19 pandemic based on its decision in Sandy Point Dental, P.C. v. Cincinnati Insurance Co., 20 F.4th 327 (7th Cir. 2021). In Sandy Point, the Seventh Circuit joined four other circuits in deciding that the mere loss of business due to COVID-related closures did not constitute "direct physical loss" when unaccompanied by any physical alteration to property. Id. at 330, 333. The court reiterated its reasoning in Sandy Point that

> [t]he phrase is "direct physical loss or damage." The words "direct physical" are most sensibly read as modifying both "loss" and "damage." But even if they can be divorced from "damage" (and we do not think that they can), they indisputably modify "loss." . . . Whatever "loss" means, it must be physical in nature.
>
> [E. Coast Ent. of Durham, 31 F.4th at 551 (quoting Sandy Point, 20 F.4th at 332)].

The court stated that similar to ECE's claim, the businesses in <u>Sandy Point</u> failed to state a claim for coverage because they "alleged neither a physical alteration to property nor an access- or use-deprivation so substantial as to constitute a physical dispossession." <u>Ibid.</u> (quoting <u>Sandy Point</u>, 20 F.4th at 337). It held that "[t]he mere presence of the virus on surfaces did not physically alter the property, nor did the existence of airborne particles carrying the virus," so the district court properly found that ECE was not entitled to coverage under its insurance policy with defendant. <u>Ibid.</u> The court also held the meaning of "direct physical loss" was "unambiguous" so "there [was] no need to construe them against the insurer," and it noted that "multiple federal district courts applying North Carolina law in COVID-19 insurance cases have reached the same conclusion as <u>Sandy Point</u>." <u>Ibid.</u>

Applying the same legal guidelines for interpreting insurance policies as noted in Section II. B. above, the Massachusetts Supreme Court in <u>Verveine Corp. v. Strathmore Insr. Co.</u> held that the plaintiffs' restaurants were not entitled to coverage for their business losses due to that state's governor's COVID-19 emergency orders prohibiting in-person dining at restaurants. 184 N.E.3d 1266, 1276 (Mass. 2022). The policies explicitly defined "'Covered Causes of Loss' as 'Risks of Direct Physical Loss,'" and the "Building and

Personal Property Coverage Form" contained in the policies provided that the

defendant insurer would

> ["]pay for <u>direct physical loss of or damage to</u> Covered Property at the [insured] premises . . . caused by or resulting from any Covered Cause of Loss." "Covered Property" includes the "building or structure" identified in each policy and personal property "[l]ocated in or on the building described in the Declarations or in the open (or in a vehicle) within [one hundred] feet of the described premises," subject to certain exclusions.
>
> [<u>Id.</u> at 1273 (second and third alterations in original).]

The Court emphasized that "in the context of the restaurants' property coverage

forms, 'direct physical loss of or damage to Covered Property' characterize[d]

what effects the covered causes must have on the property to trigger coverage,

not the causes themselves." <u>Ibid.</u>

The Court further explained,

> The "Business Income (and Extra Expense) Coverage Form" in both policies states,
>> [Defendant] will pay for the actual loss of [b]usiness [i]ncome . . . sustain[ed] due to the necessary 'suspension' of . . . 'operations' during the 'period of restoration.' The 'suspension' must be caused by <u>direct physical loss of or damage to</u> the property at [the insured premises]. . . . The loss or damage must be caused by or result from a Covered Cause of Loss.

> Likewise, the extra expense provision covers "necessary expenses . . . incur[red] during the 'period of restoration' that . . . would not have incurred if there had been no <u>direct physical loss or damage to</u> property caused by or resulting from a Covered Cause of Loss."

> [<u>Ibid.</u> (fifth alteration in original)].

The Court reasoned that "direct physical loss of or damage to property" shifts from "effect to cause, but does not change in meaning." <u>Id.</u> at 1274. The losses covered describe "the actual loss of income and certain extra expenses incurred during a defined suspension period" insofar as the suspension was "caused by the kind of loss or damage covered by the property coverage forms, which must in turn be caused by a nonexcluded risk." <u>Ibid.</u> The Court concluded that "direct physical loss of or damage to" property requires "distinct, demonstrable, physical alteration of the property," noting that "[e]very appellate court that has been asked to review COVID-19 insurance claims has agreed with this definition for this language or its equivalent." <u>Id.</u> at 1275.

In addressing the plaintiffs' contention that there was a difference between "loss" and "damage" described in the policy coverage, the court stated that "loss" is considered "a different scope that does not rely on physical alteration of the property and can include broader concepts, such as loss of use or loss of function." <u>Ibid.</u> However, it found this distinction to be irrelevant to the issue

at hand because the contention "ignore[d]" the fact that the relevant coverage provisions provided that "the loss itself must be a 'direct physical' loss, clearly requiring a direct, physical deprivation of possession." Id. at 1277. The plaintiffs were not deprived of possession of their properties and indeed continued to inhabit and use them for other purposes. Although they could not use their properties for indoor dining but only for takeout services, "[w]ithout any physical alteration to accompany it, this partial loss of use does not amount to a 'direct physical loss.'" Ibid. (alteration in original) (citing Sandy Point, 20 F.4th at 334).

Unsurprisingly, given the devasting impact of COVID-19 and state governments' efforts to curb the pandemic, there have been scores of federal and state appellate-level courts that have addressed the same issues raised in this appeal. The overwhelming majority of them have granted defendant insurers' motions to dismiss complaints seeking insurance coverage for business losses due to government orders barring or curtailing their operations in an effort to curb the COVID-19 pandemic because the losses were not due to physical loss or damage to their insured premises. See Inns-by-the-Sea v. Cal. Mut. Ins. Co., 71 Cal. App. 5th 688, 699-705 (Cal. Ct. App. 2021), rev. denied, 2022 Cal. LEXIS 1412 (Cal. Mar. 9, 2022); Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.,

15 F.4th 885, 889-893 (9th Cir. 2021); <u>Bradley Hotel Corp. v. Aspen Specialty Ins. Co.</u>, 19 F.4th 1002, 1006 (7th Cir. 2021); <u>Oral Surgeons, P.C. v. Cincinnati Ins. Co.</u>, 2 F.4th 1141, 1144-1145 (8th Cir. 2021); <u>Estes v. Cincinnati Ins. Co.</u>, 23 F.4th 695 (6th Cir. 2022); <u>Brown Jug, Inc. v. Cincinnati Ins. Co.</u>, 27 F.4th 398, 402-04 (6th Cir. 2022); <u>10012 Holdings, Inc. v. Sentinel Ins. Co.</u>, 21 F.4th 216, 219-21 (2nd Cir. 2021); <u>Santo's Italian Café LLC v. Acuity Ins. Co.</u>, 15 F.4th 398, 406-407 (6th Cir. 2021); <u>Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.</u>, 21 F. 4th 704, 710-12 (10th Cir. 2021); <u>Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.</u>, 22 F.4th 450, 455 (5th Cir. 2022); <u>Lee v. State Farm Fire & Cas. Co.</u>, __ N.E.3d __ (Ill. App. Ct. 2022) (slip op. at 11-12); <u>Sanzo Enters., LLC v. Erie Ins. Exch.</u>, 182 N.E.3d 393, 401-06 (Ohio Ct. App. 2021).

B. <u>Civil Authority</u>

Plaintiffs contend their business losses were covered by their insurance policies' "Civil Authority" clauses, which provided that defendants would "pay for the actual loss of Business Income" each plaintiff sustained that was "caused by action of civil authority that prohibit[ed] access to" its premises. To trigger civil authority coverage, plaintiffs' policies required that: (1) damage be done to other property within a certain distance of the insured premises; (2) this

damage resulted from a "Covered Cause of Loss"; (3) the civil authority prohibited access to the insured premises because of the damage; and (4) the civil authority's action was taken in response to dangerous physical conditions resulting from the damage or the continuation of the covered cause of loss or to ensure civil authority's unimpeded access to the damaged area.

Plaintiffs maintain that because other nearby businesses were ordered to partially or completely close by the EOs, a "logical reading" of their complaints established that property other than their premises sustained damage due to a covered cause of loss and that the government prevented access to their premises due to that damage. They argue their policies did not require that the government prevent all access to covered property, and that a prohibition on access by their customers for certain purposes was enough to trigger coverage under the civil authority clause.

There are no published New Jersey cases interpreting civil authority coverage provisions in an insurance policy. We, however, find guidance in Verveine and federal court rulings.

In Verveine, the Massachusetts Supreme Court directly addressed whether the plaintiffs were entitled to coverage under their insurance policies' "civil authority" clauses, which allowed for recovery of their business losses and

A-0714-20

33

expenses when an "action of civil authority . . . prohibits access to the described premises" due to "damage to property other than property at the described premises."  184 N.E.3d at 1278.  The Court determined the clauses did not provide coverage, rejecting the plaintiffs' argument that the governor's orders "prohibited public access to their restaurants and were the result of damage to properties within one mile."  Id. at 1278-1279.  The Court ruled:

> [f]or the same reasons that the presence of the COVID-19 virus at the restaurants themselves did not cause damage to property under the business interruption coverage forms, the virus did not cause "damage" to the properties within one mile of the restaurants.  Furthermore, the term "loss" is absent, precluding any argument that coverage can be based on the loss of possession or use of the surrounding buildings.
>
> [Ibid. (citation omitted).]

The Fifth Circuit Court of Appeals in Dickie Brennan & Co. v. Lexington Insr. Co. held that a civil authority clause did not apply where the plaintiff incurred business losses when an evacuation order mandated the closure of its New Orleans premises in advance of a hurricane's expected landfall.  636 F.3d 683, 685-86 (5th Cir. 2011).  The plaintiff's business and those of its neighbors were undamaged by the storm, but the plaintiff argued that its insurance policy's civil authority coverage applied because the evacuation order was issued in

response to prior property damage done on Caribbean islands by the hurricane. Id. at 684-86. The Fifth Circuit rejected this argument and denied coverage because nothing in the record demonstrated that the evacuation order was "due to" physical damage to other property. Id. at 685-86. Instead, the evacuation order was issued because of a "possible future storm surge, high winds, and flooding" in areas in the storm's predicted path. Ibid.

In United Air Lines, Inc. v. Insurance Co. of Pennsylvania, the Second Circuit held that the plaintiff airline carrier's civil authority insurance coverage did not apply to losses it sustained after Ronald Reagan Washington National Airport was shut down following the September 11, 2001 terrorist attacks. 439 F.3d 128, 134-35 (2nd Cir. 2006). Although the airport was within the required distance from the Pentagon, which was damaged, the plaintiff could not show that it was closed "as a direct result of damage to" that property since there was already a government order in place halting flights due to concern of further attacks before the Pentagon was struck by a hijacked plane. Id. at 134. The court found that the government's decision to halt operations at the airport was "based on fears of future attacks" rather than on any nearby property damage that had already occurred. Ibid.

Likewise, in <u>Philadelphia Parking Authority v. Federal Insr. Co.</u>, another case stemming from the September 11 attacks, the Southern District of New York found there was no civil authority coverage for the plaintiff's loss of income from its parking lot at an airport after all flights to and from the airport were canceled by government order. 385 F. Supp. 2d 280, 289 (S.D.N.Y. 2005). The court reasoned that civil authority coverage was properly denied by defendant carrier because the order did not "prohibit access to" the plaintiff's property but dealt only with the grounding of airplanes. <u>Ibid.</u>

Considering the plain language of the civil authority coverage as well as the persuasive Massachusetts and federal court decisions, we agree with the motion judges that plaintiffs' business losses were not protected by their policies' civil authority coverage. <u>See</u> <u>Brown Jug</u>, 27 F.4th at 404-05; <u>10012 Holdings</u>, 21 F.4th at 223; <u>Inns-by-the-Sea</u>, 71 Cal. App. 5th at 710-12; <u>United Talent Agency v. Vigilant Ins. Co.</u>, 77 Cal. App. 5th 821, 840-842 (2022); <u>Sanzo Enters.</u>, 182 N.E.3d at 406-08. First, the EOs neither prohibited access to plaintiffs' premises nor prevented plaintiff owners from being on their premises, but merely restricted their business activities. Indeed, Country Diner, Pearl, FAFB, and MPG were permitted to have customers in their establishments, to

have staff on their premises, and to prepare food for their customers' takeout orders.

Second, plaintiffs' premises were not selectively closed by the EOs due to damage to nearby property. Instead, the EOs closed or restricted activities at premises of certain types within the state all at once to curb the spread of the COVID-19 cases. There is no merit to plaintiffs' contention that because other businesses near them were closed by the EOs, the simultaneous closure or placement of restrictions on their own businesses by the same EOs triggered civil authority coverage.

C. Regulatory Estoppel

Plaintiffs assert that dismissal with prejudice was inappropriate because the motion judges should have granted them leave to file amended complaints to add a claim to bar the enforcement of the insurance policies' virus exclusions and endorsements based on the doctrine of regulatory estoppel. They contend the ensuing discovery would have enabled them to investigate the regulatory history of the virus exclusion provisions to determine whether defendants' representations to state regulators should prevent defendants from disclaiming coverage for virus-related losses. FAFB maintains the insurance industry "misrepresented" to regulators that the proposed virus exclusion language in

A-0714-20

37

insurance policies was "only a clarification that coverage was barred under the policies that existed at the time," when in fact that language "resulted in a substantial reduction in coverage."

Under the doctrine of regulatory estoppel, if an insurer makes misrepresentations to a regulatory body regarding the meaning and effect of language it has requested to include in its policies, the insurer may be prevented from enforcing the otherwise clear and plain meaning of that language against an insured. Morton Int'l v. Gen. Accident Ins. Co., 134 N.J. 1, 75-76 (1993). In Morton, our Supreme Court refused to enforce a new pollution exclusion clause as written because the Insurance Rating Board (IRB) had made misleading statements to the New Jersey Department of Insurance when requesting regulatory approval of the language. Id. at 75-78.

The Court determined that the new clause would only cover pollution damage if it resulted from a "sudden" or "accidental" event, a severe limitation on coverage that was not previously present. Id. at 29-30. Noting the coverage reduction was not accompanied by a commensurate reduction in the cost of policies containing the new pollution exclusion language compared with those that did not contain it, the Court stressed that the IRB's contemporaneous statements to regulators and the public about the new clause only suggested that

its purpose was to deny coverage to "intentional polluters," making it likely that "the typical commercial insured" would have had "little, if any, awareness" that its insurance coverage had been drastically lessened.  Id. at 73, 77.

Applying principles of equity, the Court held, "the insurance industry should be bound by the representations of the IRB, its designated agent, in presenting the pollution-exclusion clause to state regulators."  Id. at 75-76.  The Court therefore concluded the pollution exclusion should be "construed to provide coverage identical with that provided under the prior occurrence-based policy," with the only change being that it would be interpreted to exclude coverage in cases where the insured intentionally discharged a known pollutant.  Id. at 78.

In a situation identical to the present matter, the District Court of New Jersey rejected the insured's claim of regulatory estoppel related to a claim for coverage for business losses due to COVID-19.  In Delaware Valley Plumbing Supply, Inc. v. Merchants Mutual Insr. Co., the court granted the defendant insurance carrier's motion to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  519 F. Supp. 3d 178, 186 (D.N.J. 2021).  The plaintiff sought to recover income losses it incurred when the COVID-19 EOs issued by

Governor Murphy and Pennsylvania Governor Tom Wolf required plaintiff to close its businesses.  Id. at 180.  The court found that the plaintiff "entirely failed to point to" a misrepresentation made by any insurer or its representative to any regulatory agency regarding its insurance policy's virus exclusion clause.  Id. at 185.  The plaintiff also failed to demonstrate how the defendant's interpretation of the clause was inconsistent with any prior representations made by the insurance industry to regulators.  Ibid.  Instead, the court found the industry's filings with regulators "ma[d]e clear that the virus exclusion clause would bar coverage for loss or damages caused by a virus like COVID-19."  Id. at 186.  As a result, it concluded that further discovery on the topic of regulatory estoppel was "unnecessary" and dismissal of the complaint with prejudice was fitting.  Ibid.

Other federal courts have rejected regulatory estoppel arguments in the context of insurance claims for COVID-19 business losses, finding that Insured Service Offices, Inc.'s (ISO)[7] statements about proposed virus exclusion

---

[7]  Insurance Services Office, Inc. "is an influential [nonprofit] organization within the insurance industry that promulgates standard form insurance policies, including [commercial general liability] policies, that insurers across the country use to conduct their business."  Christopher C. French, Construction Defects:  Are They 'Occurrences'?, 47 Gonz. L. Rev. 1, 5 n.7 (2011/2012) (citing U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 879 n.6 (Fla.2007)).  "Most

A-0714-20

language did not mislead regulators in the same manner as the IRB did in Morton. See, e.g., Robert E. Levy, D.M.D., LLC v. Hartford Fin. Servs. Grp. Inc., 520 F. Supp. 3d 1158, 1168-69 (E.D. Mo. 2021) (holding even if Missouri adopted regulatory estoppel, it would not apply because ISO told regulators the policies were not meant to cover virus damage and defendants took the same position); Border Chicken AZ LLC v. Nationwide Mut. Ins. Co., 501 F. Supp. 3d 699, 706-07 (D. Ariz. 2020) (finding the unadopted doctrine of regulatory estoppel would not apply because ISO's circular was "clear that the [v]irus [e]xclusion is meant to exclude losses caused by pandemics" and if regulators relied on it they "would have been aware of [the exclusion's] effect on future coverage"); Brian Handel D.M.D., P.C. v. Allstate Ins. Co., 499 F. Supp. 3d 95, 100-01 (E.D. Pa. 2020) (ISO and defendant took the same position, so regulatory estoppel did not apply).

We agree with the reasoning expressed by the federal courts and thus reject plaintiffs' regulatory estoppel arguments. Allowing plaintiffs to amend their complaints to add regulatory estoppel claims would not result in a different

---

[commercial general liability] insurance policies in the United States are written on standard forms developed by ISO and made available with state insurance regulators." Cypress Point Condo. Ass'n v. Adria Towers, L.L.C., 226 N.J. 403, 409 n.5 (2016).

outcome. Their claims would eventually fail because defendants have not taken a position regarding the interpretation of the virus exclusions that is any different from ISO's representations to regulators as set forth in the federal court rulings. ISO told regulatory bodies in 2006 that the new virus exclusion would bar all coverage for virus-related damage and losses.

While it may have used the same "clarify" language that our Supreme Court found misleading in Morton, that case is distinguishable. In Morton, 134 N.J. at 75-78, the IRB made false statements that coverage would continue for the same types of pollution damage going forward, while here, with respect to virus exclusion, the ISO plainly stated that there would be no coverage for any virus-related claims, Delaware Valley Plumbing Supply, 519 F. Supp. 3d at 186. And as noted, we conclude the motion judges properly dismissed plaintiffs' complaints with prejudice because their business losses due to the EOs were not covered under their policies with defendants, regardless of whether the virus exclusions applied. Therefore, giving plaintiffs the opportunity to amend their complaints would be futile, and dismissal with prejudice was proper. See Prime Acct. Dep't v. Twp. of Carney's Point, 212 N.J. 493, 511 (2013).

IV.

Since we have concluded that plaintiffs were not entitled to insurance coverage provided by defendants because their business losses were not due to physical loss of or damage to their properties, nor due to actions by civil authority, we need not consider defendants' contentions that their policies contain provisions stating there would be no coverage for losses due to a virus, which includes COVID-19. Each motion judge agreed with defendants. Yet, for the sake of completeness, it is important to address the exclusion.[8]

The policies of two plaintiffs—MPG and FAFB—had exclusion sections stating the insurer would not "pay for loss or damage caused directly or indirectly by any" of a list of several causes. One of the listed exclusions was for loss or damage caused by "[a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." MPG's and FAFB's exclusions sections contained anti-concurrent and anti-sequential causation language stating that damage caused by one of the excluded perils was not covered "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." As a result, if a virus in any way contributed to MPG's and FAFB's losses of business income, those

---

[8] We note that the motion judge dismissed Mattdogg's complaint with prejudice because he found that the virus exclusion applied and did not address whether Mattdogg had alleged a "direct physical loss" sufficient to trigger coverage.

A-0714-20

losses were not covered. Additionally, FAFB's policy contained an "advisory notice" notifying it of the virus exclusion.

The policies of the four other plaintiffs—Country Diner, Pearl, Mattdogg, and Precious Treasures—did not include a virus exclusion in their excluded coverage sections. However, the policies contained endorsements stating that damage "caused by or resulting from" a virus, bacterium, or other microorganism was not covered.[9] An "endorsement alters the policy only to the extent set forth in the text of the endorsement. In other words, the terms and conditions of the basic policy form remain in full force and effect, except to the extent they are expressly altered by the endorsement." 3 Jeffrey E. Thomas, New Appleman on Insurance Law Library Edition, § 21.01 (2013). The anti-concurrent and anti-sequential causation language in the base policies' exclusion sections thus did not apply. Therefore, to disclaim coverage in these plaintiffs' cases, the relevant defendants needed to show that their respective plaintiffs' losses of income were "caused by or resulted from" the coronavirus, as stated in the express language of the endorsements.

---

[9] In addition, Mattdogg's policy contained an "advisory notice to policyholders" stating there was "no coverage" for losses or damage "caused by or resulting from" viruses, bacteria, or other microorganisms.

A-0714-20

Exclusions in insurance contracts "are presumptively valid and will be given effect if 'specific, plain, clear, prominent, and not contrary to public policy.'" Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 95 (1997) (quoting Doto v. Russo, 140 N.J. 544, 559 (1995)). However, they "must be narrowly construed," and "the burden is on the insurer to bring the case within the exclusion." Ibid. Accordingly, an insured is "entitled to protection to the full extent that any reasonable interpretation of [exclusionary clauses] will permit." S.N. Golden Ests., Inc. v. Cont'l Cas. Co., 293 N.J. Super 395, 401 (App. Div. 1996).

Where a particular exclusion "requires a causal link," a judge must "consider its nature and extent because evaluating that link will determine the meaning and application of the exclusion." Flomerfelt v. Cardiello, 202 N.J. 432, 442-43 (2010). "The fact that two or more identifiable causes—one a covered event and one excluded—may contribute to a single property loss does not necessarily bar coverage." Simonetti v. Selective Ins. Co., 372 N.J. Super. 421, 431 (App. Div. 2004). Generally, "[i]n situations in which multiple events, one of which is covered, occur sequentially in a chain of causation to produce a loss," the New Jersey courts have found that "the loss is covered if a covered cause starts or ends the sequence of events leading to the loss." Flomerfelt, 202

N.J. at 447. Referred to as the "Appleman Rule," this principle means that if an insured peril sets other causes in motion which ultimately produce a loss, the insured peril at the start of the unbroken sequence is considered the proximate cause of the entire loss and recovery is permitted even if excluded perils form other links in that sequence. Search EDP, Inc. v. Am. Home Assur. Co., 267 N.J. Super. 537, 543 (App. Div. 1993).

In contrast, "if the claimed causes, one covered and one not, combine to produce an indivisible loss," the courts "have rejected claims for coverage largely because of the allocation of the burden of proof on the insured to demonstrate a covered cause for a loss." Flomerfelt, 202 N.J. at 447-48. The definitive question is what predominantly caused the loss, meaning the efficient proximate cause, not where in the sequence the alleged cause of loss occurred. See Franklin Packaging Co. v. Cal. Union Ins. Co., 171 N.J. Super. 188, 191 (App. Div. 1979).

An insurance policy clause containing "an anti-concurrent or anti-sequential clause" has been interpreted to unambiguously bar coverage for losses resulting in any manner from an excluded cause. Wear v. Selective Ins. Co., 455 N.J. Super. 440, 454-55 (App. Div. 2018). Thus, coverage is excluded for a loss attributable to a given cause "regardless of whether any other cause,

event, material or product contributed concurrently or in any sequence" to that loss. Id. at 454.

Applying New Jersey law in cases like those before us, the District Court of New Jersey has found that virus exclusions in insurance policies precluded coverage for business income losses attributed to the EOs. In Delaware Valley Plumbing Supply, the plaintiff plumbing fixture company's policy stated the defendant insurer would not pay for loss or damage "caused directly or indirectly by . . . any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." 519 F. Supp. 3d at 180. The plaintiff's complaint alleged that its economic damages were caused by the EOs, and the court found that the EOs in turn were issued "to mitigate the spread of the highly contagious novel coronavirus." Id. at 182 (internal quotation marks omitted). The court held that the plaintiff's losses were inextricably tied to the virus and "the [v]irus [e]xclusion, by its specific, clear language, bar[red] coverage" for the plaintiff's losses. Ibid. Thus, plaintiff's complaint was dismissed with prejudice due to the policy's virus exclusion pursuant to the Federal Rule of Civil Procedure 12(b)(6). Id. at 186. See also Mashallah, Inc. v. W. Bend Mut. Ins. Co., 20 F.4th 311, 320-22 (7th Cir. 2021); Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am., 15 F.4th 885, 893-94 (9th Cir. 2021); Goodwill

Indus. of Cent. Okla., Inc., 21 F. 4th at 712-14; Beniak Enters., Inc. v. Indem. Ins. Co. of N. Am., 556 F. Supp. 3d 437, 443-45 (D.N.J. 2021); Nguyen v. Travelers Ins. Co. of Am., 541 F. Supp. 3d 1200, 1222-23 (W.D. Wash. 2021); Diesel Barbershop, LLC v. State Farm Lloyds, 479 F. Supp. 3d 353, 360-62 (W.D. Tex. 2020); Humans & Res., LLC v. Firstline Nat'l Ins. Co., 512 F. Supp. 3d 588, 600-601 (E.D. Pa. 2021); Nail Nook, Inc. v. Hiscox Ins. Co., 182 N.E.3d 356, 361-62 (Ohio Ct. App. 2021); Border Chicken, 501 F. Supp. 3d at 704-05.

Plaintiffs argue the motion judges should not have considered the virus exclusions and endorsements when addressing a motion to dismiss under Rule 4:6-2(e) because the applicability of an exclusion in an insurance policy is an affirmative defense that a defendant must plead in an answer. They also assert that, in any event, defendants did not satisfy their burden of proving that plaintiffs' claims were barred under the virus exclusions and endorsements.

Generally, Rule 4:6-2(e) dismissals should not be granted based on an affirmative defense because such defenses typically "must be pleaded." Prickett v. Allard, 126 N.J. Super. 438, 440 (App. Div. 1974). Rule 4:5-4 lists affirmative defenses that a responsive pleading "shall set forth," such as fraud, duress, estoppel, res judicata, statute of limitations, and waiver. The applicability of an exclusion clause in an insurance contract is not among these,

but the Rule states that its list is not exhaustive. Ibid. If, however, an affirmative defense's applicability "appears on the face of the complaint," dismissal under Rule 4:6-2(e) may be proper. Prickett, 126 N.J. at 440. In Prickett, the Court found that dismissal for failure to state a claim was proper because the applicability of a statute of limitations was clear from the complaint despite the fact it was an affirmative defense. Ibid.

Plaintiffs' complaints alleged breach of contract claims or sought declaratory judgment that they were entitled to coverage for their business losses related to COVID-19 EOs' restrictions. Not only were the policies referenced in the complaints but copies, including the exclusion sections and endorsements, were attached. The complaints specifically mentioned COVID-19 and attached the EOs. The applicability of the policies' virus exclusions was presented on the face of plaintiffs' pleadings. Hence, it was appropriate for the motion judges to consider the virus exclusions and endorsements when deciding defendants' motions to dismiss.

In granting defendants' motions, it was appropriate for the judges to consider COVID-19 a virus and, therefore, apply the virus exclusions and endorsements in the insurance policies. Contrary to plaintiffs' assertions, COVID-19's status as a viral disease was not a contested fact and thus discovery

was unneeded to clarify the scientific basis of the EOs and to challenge the insurers' contention that their claims were barred by the virus exclusions. Plaintiffs' complaints cite the EOs, which discuss the nature of COVID-19 and state that it is caused by a virus. Although the EOs are not scientific documents issued by epidemiology experts, the EOs reference findings by the CDC and WHO, agencies focused on the protection of public health and having expertise in infectious diseases, pathogens, and other sources of illness.[10] The motion judges were permitted to take judicial notice under N.J.R.E. 201(b) and (f),[11] that COVID-19 is a viral disease, since scientists have stated that this is so since

---

[10] See Mission, Role and Pledge, https://www.cdc.gov/about/organization/mission.htm (last visited June 13, 2022); Who We Are, https://www.who.int/about/who-we-are (last visited June 13, 2022).

[11] N.J.R.E. 201(b) provides that a judge may take judicial notice of certain types of facts, including "such specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute," and "specific facts and propositions of generalized knowledge which are capable of immediate determination by resort to sources whose accuracy cannot reasonably be questioned."

N.J.R.E. 201(f) provides judge may consult or use "any source of relevant information" when deciding whether to take judicial notice of a fact, and the rules of evidence generally do not apply.

A-0714-20

shortly after it was first identified.[12]  We are unaware of, nor do plaintiffs cite, any credible information that contradicts the widely-held knowledge that COVID-19 is caused by a virus.

Plaintiffs' claims were barred by the virus exclusions and endorsements in their policies.  Even though no plaintiff alleged the COVID-19 virus was present at their premises, it is unequivocal that the virus was the sole reason the EOs were issued to close or restrict plaintiffs' businesses.

MPG and FAFB's policies contained virus exclusions that included anti-concurrent and anti-sequential causation language, undoubtedly barring coverage.  COVID-19 contributed to their business losses, and therefore their insurers satisfied their burden to show that the exclusions applied regardless of whether the EOs were considered a concurrent or sequential cause.

The endorsements in the policies of Mattdogg, Precious Treasures, Country Diner, and Pearl did not contain anti-concurrent causation language but required the insurers to show that their claims were "caused by or resulted from"

---

[12]  See Identifying the source of the outbreak, https://www.cdc.gov/coronavirus/2019-ncov/science/about-epidemiology/identifying-source-outbreak.html (last visited June 13, 2022); WHO Statement regarding cluster of pneumonia cases in Wuhan, China, https://www.who.int/china/news/detail/09-01-2020-who-statement-regarding-cluster-of-pneumonia-cases-in-wuhan-china (last visited June 13, 2022).

the COVID-19 virus to disclaim coverage.  The phrases "caused by" and "resulting from" have been interpreted as "clearly convey[ing] the idea of proximate causation."  Westchester Fire Ins. Co. v. Continental Ins. Cos., 126 N.J. Super. 29, 37-38 (1973).  The EOs, which were not an excluded peril, were the final step in the sequence that caused plaintiffs' businesses to shut down or curtail their operations and suffer income losses.

Yet, following the Appleman rule, the EOs were only issued to curb the COVID-19 pandemic, making the virus the efficient proximate cause of plaintiffs' losses.  Therefore, like the district court held in Delaware Valley Plumbing Supply, we conclude the EOs were inextricably intertwined with COVID-19.  Because plaintiffs' business losses thus were "caused by or resulted from" COVID-19 virus, their policies' endorsements bar coverage.

## V.

In sum, we conclude the motion judges were correct in dismissing plaintiffs' complaints with prejudice under Rule 4:6-2(e) because plaintiffs' business losses were not caused by physical loss or damage to their properties, as required for coverage under their insurance policies with defendants, but by restrictions imposed by EOs to curb the COVID-19 pandemic.  We discern no reason to depart from the persuasive reasoning expressed in East Coast

Entertainment of Durham, Verveine, and the scores of federal courts and other state appeal courts that have rejected identical insurance claims seeking business losses as a result of being forced to shut down or significantly limit their operations due to the imposition of government orders to curb the COVID-19 pandemic.

Allowing plaintiffs to amend their complaints to add claims of regulatory estoppel would not overcome dismissal with prejudice because defendants have not taken a position regarding the interpretation of the virus exclusions that is any different from its designated agent's representations to regulators. Plaintiffs' business losses are not covered under their policies' civil authority clauses because their businesses were not closed or limited by civil authority but by the EOs intended to minimize the devastating impact of COVID-19. In addition, the insurance policies' exclusions and endorsements barring coverage for viruses preclude coverage for plaintiffs' insurance claims.

We recognize that COVID-19 has caused overwhelming economic losses to untold businesses and individuals dependent on those businesses in our state, nation, and the world. Nevertheless, in the context of the issues presented in this appeal, plaintiffs' insurance claims are restricted by the clear and plain

A-0714-20

53

meaning of their insurance policies, which we cannot rewrite to cover their unfortunate losses.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0714-20

54